Counsel of Record:
Mark K. Schonfeld (MS-2798)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-1020
(212) 336-1322 (fax)



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

JUDGE CASTEL

**SECURITIES AND EXCHANGE COMMISSION,**
                                                              :
                            **Plaintiff,**                    :
                                                              :
          -against-                                           :
                                                              :
**EMPIRE DEVELOPMENT GROUP, LLC**                             :
**EMPIRE DEVELOPMENT GROUP FUND I LLC,**                      :
**CASTLE HILL VENTURES, LLC,**                                :
**FELIX STRASHNOV a/k/a FELIX STRATON and**                   :
**MICHAEL AYNGORN,**                                          :
                                                              :
                            **Defendants.**                   :
                                                              :
-------------------------------------------------------------x

**07 CIV 3896**
07 Civ. ( )

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") brings this action

against Defendants Castle Hill Ventures ("Castle Hill"), Empire Development Group Fund I LLC

("EDGFI"), Empire Development Group LLC ("EDG"), Felix Strashnov, a/k/a Felix Straton

("Straton"), and Michael Ayngorn ("Ayngorn") (collectively, the "Defendants"). The

Commission alleges the following:

### SUMMARY

1.      From approximately November 2004 through the present, the Defendants have

engaged in high pressure sales tactics and cold-calling to sell securities in unregistered

transactions in EDG and EDGFI, a bogus real estate development company, to unsuspecting investors, at least some of whom are elderly people with limited means. As set forth below, the Defendants have induced investors to purchase these securities by making numerous material misrepresentations to them.

2.      Defendants sold securities through two unregistered offerings, the first described in a November 1, 2004 private placement memorandum (the "2004 PPM"), and the second described in an October 23, 2006 private placement memorandum (the "2006 PPM") (collectively, the PPMs). In connection with these offerings (the "Offerings"), Defendants violated federal securities laws by, *inter alia:* materially misrepresenting to investors how they intended to use the proceeds of the Offerings; materially misrepresenting the risks associated with the offered securities; and failing to comply with the registration requirements imposed on parties marketing securities to the individual investors who, based on their income and net worth, are not "accredited" investors for purposes of the securities laws.

3.      In addition to the PPMs, the Defendants have sent many letters to investors ("shareholder letters").

4.      The PPMs and shareholder letters contain numerous material misrepresentations and omissions.

5.      For example, several shareholder letters misrepresented that EDG was registered with the Commission and that such registration was "the first step to allow EDG to achieve Public Market status for the company's shares." In fact, EDG is not registered with the Commission and is not close to completing an initial public offering ("IPO"). As defendant Straton admitted when he was interviewed by Commission staff, taking EDG public is a

2

"dream" that EDG is not close to achieving.

6.      Defendants have collected, and continue to solicit, money from investors based on promises that, among other things, the investors will own a part of a thriving real estate investment company. In fact, EDG and EDGFI have no real estate assets and appear to have dissipated the funds collected from investors. To the extent any investors' money actually has been utilized for real estate, it has been used to purchase and renovate private homes for Straton and Ayngorn.

## VIOLATIONS

7.      Through this conduct, and that detailed below, the Defendants have violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## JURISDICTION

8.      The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), seeking to temporarily restrain, preliminarily enjoin, and permanently enjoin the Defendants from engaging in the wrongful conduct alleged in this complaint. In addition, the Commission seeks a final judgment ordering the Defendants to disgorge their ill-gotten gains, to pay prejudgment interest thereon and to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d). The Commission also seeks temporarily, and during the pendency of this action, an order freezing the Defendants' assets, and an order directing the Defendants to provide verified

accoutings. Additionally, the Commission seeks an order directing the Defendants to provide expedited discovery and prohibiting the destruction, alteration, or concealment of documents. Finally, the Commission seeks all other just and appropriate relief.

9.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 77u(e) and 78aa.

10.     Venue lies in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York.

11.     The Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

## THE DEFENDANTS

12.     **EDG** purports to be a Delaware limited liability company organized on October 15, 2004 as Castle Hill Ventures, LLC.   According to EDG's 2006 private placement memorandum, Castle Hill changed its name to EDG on October 4, 2006.  EDG's office is located at 1795 Coney Island Avenue, Brooklyn, New York, 11230.  EDG is a managing member of EDGFI.  Defendants Straton and Ayngorn are the principals of EDG.

13.     **EDGFI** purports to be a private real estate investment fund organized as a Delaware limited liability company.  Castle Hill, and subsequently EDG, was the managing

4

member of EDGFI.

14.     **Castle Hill** purports to be a Delaware Limited Liability Company organized on October 15, 2004 and, purportedly changed its name to EDG in October 2006. However, Defendants used the EDG name in connection with the sale of EDGFI units, at least as far back as December 2004. Upon information and belief, some funds obtained by the Defendants from investors continue to be held in accounts in the name of Castle Hill. Defendants Straton and Ayngorn are the principals of Castle Hill.

15.     **Straton**, age 36, is a managing member of EDG. Straton is a resident of Brooklyn, New York and holds a Series 7 and Series 63 license. Straton was formerly associated with Paragon Capital Markets, Inc. and Barrett Day Securities. Straton was sued by the New York State Attorney General's Office in July 1996 for fraud and misappropriation based on the offer and sale of stock of a defunct New Jersey corporation and consented to a judgment enjoining him from engaging in fraudulent practices and prohibiting him from offering, selling, or promoting any securities within or from New York State until and unless full restitution was paid to defrauded investors.

16.     **Ayngorn**, age 35, is also a managing member of EDG. Ayngorn is a resident of Brooklyn, New York. Ayngorn does not hold any securities licenses but has worked at four broker-dealers, J.S. Securities, Inc., Greenway Capital Corp., Toluca Pacific Securities and E.C. Capital.

## FACTS

### The Defendants Unlawfully Sold Securities Through Unregistered Offerings

17.     Straton and Ayngorn formed EDG, originally named Castle Hill Ventures, and

5

EDGFI, in October 2004. Castle Hill, and subsequently EDG, have been the managing members of EDGFI. EDGFI purports to be a limited liability company engaged in real estate development.

18.    In approximately November 2004, EDGFI commenced an unregistered offering of its securities to investors. Investors were offered membership interests packaged as units in EDGFI. Defendants intended to raise $5 million in the November 2004 private placement through the sale of 100 units of EDGFI priced at $50,000 each.

19.    EDG conducted a private placement in October 2006 that was intended to raise $25 million by the sale of 500 units in EDG at a price of $50,000 per unit. Like EDGFI, EDG purports to be a limited liability company engaged in real estate development. EDG and EDGFI have the same principals and the same office space in Brooklyn, New York. The units were comprised of membership interests in EDG and certain warrants.

20.    Other than the number of units to be sold and the amount of money to be raised, the private placement memoranda for the offerings contain similar misrepresentations.

21.    The PPMs purport to offer investors the opportunity to participate in the real estate market by purchasing units in a fund that will be used to purchase investment properties including individual and multi-family residential properties, renovate them, and resell at a profit.

22.    Both PPMs stated that the EDG and EDGFI Offerings were made pursuant to Rule 506 of Regulation D, 17 C.F.R. § 230.506 ("Rule 506") and were therefore exempt from the Securities Act's registration requirements.

23.    However, neither offering satisfies the requirements necessary to be exempt from registration under federal securities law due to, *inter alia*, the number of offerees, their relative lack of sophistication and the size and manner of the Offerings.

6

24.    The Defendants sold units in both offerings by a general solicitation to members of the public, using high-pressure cold calls to solicit unaccredited investors.

25.    To date, EDG claims to have raised between $1.2 - $1.5 million from approximately 50 to 100 investors. These investors reside in at least 3 states.

26.    Defendants solicited investors from EDG's office in Brooklyn, New York, which is, in effect, a "boiler room" – a cold-calling center used to facilitate high-pressure sales tactics in the sale of securities. On May 1, 2007, Commission staff observed, among other things, the following evidence of an operating boiler room:  (a) EDG business cards, taped to the phones or near the phones; (b) hundreds of lead cards; (c) an apparent sales script; (d) numerous small maps containing the U.S. time zones; (e) EDG correspondence to investors; (f) an apparent investor contact list containing hand-written notes, such as "left message" and "not interested"; (f) two versions of EDG private placement memoranda; and (g) a box of professionally printed color brochures featuring EDG.

27.    By Defendants' own admission, they engaged in a general solicitation to sell units in EDG and EDGFI using purported marketing companies to generate a telemarketing list of individuals, which the marketing company would then contact. Supposedly, the marketing company would ask the individuals if they were interested in receiving a package about investing in real estate. The individuals would then be sent a package about EDG, and, according to Straton, would contact EDG in order to invest.

28.    However, at least two elderly investors, Investor A, age 93, and Investor B, age 79, were initially contacted by EDG by telephone, and had no previous connection with EDG or the EDG representative who contacted them. Both investors recalled telling the caller that they

had little money to invest.  And both investors were ultimately persuaded by the caller to invest as much money as they could.

29.     Investor A is a resident of Toms River, New Jersey.  Investor B is a resident of Monticello, Indiana.

30.     During the past two years, Investor A and Investor B received numerous mailings from EDG and received numerous phone calls from various EDG salesman soliciting additional investments.

31.     Both Investor A and Investor B were persuaded by the letters and phone calls from EDG to increase their investments on a number of occasions.

32.     Neither EDG nor EDGFI have financial statements and financial statements were not provided to Investor A and Investor B.

33.     EDG and EDGFI did not provide the PPM to Investor A and Investor B until after they had begun to invest.

34.     The Defendants also solicited an investment from another investor, an 86 year old man residing in Pennsylvania.

35.     EDG and EDGFI did not file a registration statement for their sales of securities, and a registration statement was not otherwise in effect.  The Offerings therefore violated Section 5 of the Securities Act.

**EDG Misrepresented Material Facts in Its PPMs and in Letters to Shareholders**

36.     The November 1, 2004 PPM represented that EDG would use the offering proceeds for "(i) cash investments in foreclosure-related investment properties, property rehabilitation construction costs, and related capital improvements, together with associated legal

8

fees and closing costs, (ii) property casualty and liability insurance premiums, (iii) real estate

market research and related foreclosure marketing expenses, and (iv) general administrative and

overhead expenses of [EDGFI], including an annual management fee payable to [EDG], salaries

payable to the [the] Managing Directors, and Fund-related legal and accounting fees, including

those associated with this Offering."

37.     The November 1, 2004 PPM also represented, among other things:

> Our plan is to identify investment-worthy properties that we determine to
> be located in neighborhoods or areas in which we believe property values .
> . . are generally rising, acquire them on favorable terms, renovate them if
> necessary, and either sell them as quickly as possible, or, if not already
> leased, lease them . . .

> We expect to acquire fee simple title to each of our investment properties .
> . . , either directly or through special purpose entities that we establish for
> that purpose.  Such fee interest may be held by us alone or together with
> one or more joint venture partners with whom we have determined to
> jointly invest or otherwise participate. . . .

38.     Similarly, the October 23, 2006 PPM represented that EDG would use the

offering proceeds for "(i) real estate market research and project feasibility studies, (ii) the

acquisition of raw land and improved parcels, . . . (iii) development expenses, including without

limitation legal services, architectural services, engineering services, building materials, building

contractor services and other labor, and finance-related interest and costs, (iv) liability and other

insurance premiums, (v) unit marketing expenses, and (vi) general working capital, including

salaries payable to [the] executive officers."

39.     The October 23, 2006 PPM also offered investors the opportunity to participate in

the real estate market by purchasing units in a fund that will be used to "acquire a portfolio of

single and multi-family attached residential real estate properties including underdeveloped

parcels for development, renovation or rehabilitation . . . and ultimately for resale."

40.    Neither PPM discloses Straton's previous disciplinary history. Straton was sued by the New York State Attorney General's Office in July 1996 for fraud and misappropriation based on the offer and sale of stock of a defunct New Jersey corporation and consented to a judgment enjoining him from engaging in fraudulent practices and prohibiting him from offering, selling, or promoting any securities within or from New York State until and unless full restitution was paid to defrauded investors. Straton signed a Form 99, a notification of securities offering, filed with the State of New York in November 2005 in which he falsely answered that no principal of EDGFI had ever been the subject of an injunctive or cease and desist order concerning the offering of securities.

**EDG Does Not Own Any Property**

41.    Despite the fact that the first private placement was offered in November 2004, EDG and EDGFI have not purchased any properties in their own name. Instead, the only properties Straton and Ayngorn have identified as EDG investments turn out to be their own private homes, held in their own names.

42.    The first property is located at 2 Harris Place, Fairlawn, New Jersey. This property is held in Straton's name. Straton acknowledged to Commission staff that the Fairlawn property was purchased in his name.

43.    At EDG's office the Commission staff reviewed a set of blueprints for the renovation of this property that were labeled "Strashnov Residence." In addition, minutes of a zoning board meeting for the town of Fairlawn at which Straton applied for a variance for the Fairlawn property reveal that Straton advised the zoning board that he intended to live in the

property.

44.     Straton stated that the purchase price of the Fairlawn property was approximately $435,000 and that renovations would cost between $300,000 - $400,000.

45.     Straton told the Commission's staff that EDG's second property was located in Brooklyn, New York, at an address he said that he could not recall, and had been purchased in 2005 in Ayngorn's name.

46.     A search of public records indicates that there is only one property in Brooklyn purchased in Ayngorn's name. That property, 2359 Royce Street, was purchased in the names of Ayngorn and his wife Diana in July 2005 for $635,000. At that time, two mortgages were taken against the property for a total of $600,000.

47.     On or about September 11, 2006, Ayngorn transferred his interest in the Brooklyn property to his wife for no apparent consideration. On the transfer records filed with the City of New York, Ayngorn and his wife identify the Brooklyn property as their residence and list the Royce street address as their primary address.

48.     By the Defendants' own admission, other than those two properties, EDG has no other properties or sources of revenue. According to Straton, EDG has very little money in the bank and the properties, expenses, and salaries have depleted the funds raised in the Offerings.

49.     Neither the PPMs nor EDG's letters to shareholders disclose that investor funds would be used to purchase personal properties for the defendants. In fact, the November PPM specifically represents that EDG will hold title directly, through special purpose entities, or jointly with joint venture partners.

50.     Shareholder letters sent by the Defendants to investors contain misrepresentations

11

and numerous misleading statements. For example, a November 2, 2005 letter to shareholders,

including Investor A and Investor B, states that:

> EDG is very pleased to announce that the company has registered with the
> Securities and Exchange Commission as well as filing with the New York State
> Securities Investor Protection & Real Estate Financing Bureau. . . . . These
> registrations are the first major step to allow EDG to achieve Public Market status
> for the company's shares.

51.    Shortly thereafter, on November 28, 2005, EDG sent Investor A and Investor B a

sheet entitled "Instructions to view SEC Filings" that provides the EDGAR link to EDG's notice

to sell shares under Regulation D. This notice is not a registration statement. Nevertheless, the

link to the notice appears intended to deceive potential and existing shareholders by creating

support for the representation that EDG intends to achieve "Public Market" status.

52.    At least two other shareholder letters contain similar misrepresentations stating

"EDG has also started the process that will ultimately see our shares registered and listed with

the Securities and Exchange Commission (SEC)" and:

> The company has formulated plans to register the Empire Development Group
> (EDG) Real Estate Fund with the Securities and Exchange Commission (SEC).
> By becoming a publicly reporting company we will allow Investors complete
> financial transparency with audited financials. Also, by achieving reporting
> company status we take the next step forward to potentially becoming a publicly
> traded company. . . .

53.    When the staff questioned Straton about his plans for the company on May 1, he

stated that it would be his "dream" to take the company public and acknowledged that he is not

close to achieving that "dream." He said the first step for the company would be to get into the

"black" and acknowledged that EDG has not generated any revenues and continues to operate in

the "red."

12

54.    In addition to Straton's admission that a public filing was a "dream" of his, a review of the Commission's public records fails to turn up any filings by EDG relating to the registration of securities for a possible initial public offering.

55.    These facts were unknown to investors who were persuaded to invest, in part, because they were led to believe that an initial public offering was imminent and they would be able to sell their units to the public at a profit.

56.    The shareholder letters contain numerous misleading statements designed to make an investor believe that EDG is a safe investment. For example, Ayngorn sent a letter to Investor B on or about August 9, 2005 an investor stating EDG "has structured its Fund to allow Investors the opportunity to receive every penny of their investment back, then continue on to receive income distributions of net proceeds for the life of the fund." Investor B was told by an EDG representative that he would be able to get his money back if he needed it. Investor B invested in EDG after receiving the August 9, 2005 letter.

57.    An EDG representative told Investor B during a telephone call that he would be able to get his money back if he needed it.

58.    Investor A's son contacted EDG to request that his father's investment be returned, and Defendants refused to grant his request.

59.    The shareholder letters contain baseless projections regarding EDG's ability to obtain financing, obtain and develop real estate projects and generate profit imminently. For example, one letter dated January 5, 2007, sent to Investor A and Investor B, states:

> Management is currently in negotiations with corporate counsel to achieve a large financial infusion thru *Pipeline Financing*, utilizing some of the financial communities (sic) biggest names. Plans for an additional round of financing are currently underway, which from inception is expected to be 50 million dollar offering. Management is

13

expecting the majority of the share allocations going to institutional investments.

60.    Another letter states: "[F]ollowing the completion of EDG's 5 Million dollar

Fund I Equity Financing, Management projections for Gross Revenue are expected to exceed 40

Million dollars within the next 5 years...."

61.    Discussing the price of properties that EDG does not own, another letter states

"these price ranges allow us to achieve profit margins in excess of 400-600 thousand dollars per

project. Achieving a return on investment dollar of 75-125 percent (sic)."

62.    Yet another letter states: "[W]e feel that Development Projects will be much more

profitable with conservative expected Return On Investment of 150-300% or better. We feel that

our expected Revenue growth should exceed $18-21 Million within 36 months of commercial

operations, while achieving Working Capital in excess of $9-12 Million in that same time

period."

63.    The representations are false and misleading and lack a reasonable basis in fact.

Straton told the Commission's staff that EDG is operating in the "red," does not have financial

statements, has not sold a single property, and has merely purchased personal residences for the

Defendants.

## FIRST CLAIM FOR RELIEF

Violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a),
Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),
and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5

64.    The Commission repeats and realleges the allegations contained in paragraphs 1

through 63 by reference as if fully set forth herein.

65.    The Defendants, directly and indirectly, singly and in concert, knowingly or

14

recklessly, by the use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or by the use of the mails, in the offer or sale, and in connection with the purchase or sale, of securities, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of, or otherwise made untrue statements of material fact, or omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices and courses of business which operated or would operate as a fraud or deceit upon purchasers of securities or other persons.

66.     As part, and in furtherance, of this violative conduct, the Defendants made the misrepresentations alleged above in paragraphs 36 through 62.

67.     The misrepresentations made by the Defendants described above were material.

68.     The Defendants knew, or were reckless in not knowing, that these material misrepresentations were false or misleading.

69.     By reason of the acts, omissions, practices, and courses of business set forth in this complaint, the Defendants have violated, are violating, and unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

Violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a) and (c)

70.     The Commission realleges and incorporates paragraphs 1 through 63 by reference as if fully set forth herein.

71.    The Defendants, directly and indirectly, singly and in concert, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise when no registration statement has been filed or was in effect as to such securities and when no exemption from registration was available.

72.    By reason of the foregoing, the Defendants violated, are violating, and unless restrained and enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a) and (c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Commission respectfully requests that this Court issue:

### I.

Orders temporarily and preliminarily, and Final Judgments permanently, restraining and enjoining the Defendants, their agents, servants, employees, attorneys in-fact, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### II.

Orders temporarily and preliminarily, and Final Judgments permanently, restraining and enjoining the Defendants, their agents, servants, employees, attorneys in-fact, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities

16

Act, 15 U.S.C. § 77e(a) and (c).

### III.

An Order directing the Defendants, and their financial and brokerage institutions, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them who receive actual notice of such Order by personal service, facsimile service, or otherwise, to hold and retain within their control, and otherwise prevent, any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal of any assets, funds, or other property (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever) of, held by, or under the control of the Defendants, whether held in their names or for their direct or indirect beneficial interest wherever situated.

### IV.

An Order directing the Defendants to each file with this Court and serve upon the Commission verified written accountings, signed by each of them under penalty of perjury.

### V.

An Order permitting expedited discovery.

### VI.

An Order enjoining and restraining the Defendants, and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing, or otherwise interfering with the access of the Commission to relevant documents, books and records.

### VII.

A Final Judgment requiring the Defendants to disgorge their ill-gotten gains from the

violative conduct alleged in this complaint, and to pay prejudgment interest thereon.

## VIII.

A Final Judgment imposing civil monetary penalties pursuant to Section 20(d) of the

Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C.

§ 78u(d), against the Defendants.

## IX.

Such other and further relief as the Court deems appropriate.

Dated:  May 17, 2007
 New York, New York

Respectfully Submitted,

*Doria G. Stetch*
_____
Mark K. Schonfeld (MS-2798)
Doria G. Stetch (DS-3307)
ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-1020

Of Counsel:

Andrew M. Calamari
Meaghan Cheung
Michael Paley
Michael Birnbaum

18