Counsel of Record:
Mark K. Schonfeld (MS-2798)
Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-1020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,** :
                                   :

           **Plaintiff,** :

       :

    -against- :

       :     **07 Civ.**    **(**   **)**

**EMPIRE DEVELOPMENT GROUP, LLC.** :
**EMPIRE DEVELOPMENT GROUP FUND I, LLC** :
**CASTLE HILL VENTURES, LLC,** :
**FELIX STRASHNOV a/k/a FELIX STRATON and** :
**MICHAEL AYNGORN,** :

       :

        **Defendants.** :

       :

-------------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS EMERGENCY APPLICATION FOR A
## TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION,
## ORDER TO SHOW CAUSE, ASSET FREEZE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission") submits this

memorandum of law in support of its emergency application for a Temporary Restraining Order,

Preliminary Injunction, Order to Show Cause, Asset Freeze and Other Relief in its action against

Empire Development Group, LLC ("EDG," or the "Company"), Empire Development Group

Fund I, LLC ("EDGVI"), Castle Hill Ventures, LLC ("Castle Hill"), Felix Strashnov ("Straton")

and Michael Ayngorn (collectively, "Defendants") on the basis of current and continuing

violations of federal securities laws.

## PRELIMINARY STATEMENT

Since 2004, Defendants have offered and sold, and continue to offer and sell, securities

that Defendants have maintained represent "membership interests" in EDG and EDGVI.

Defendants sold securities through two offerings, the first described in a November 1, 2004

private placement memorandum (the "2004 PPM," submitted as Exhibit 1 in accompanying

Appendix[1]), and the second described in an October 23, 2006 private placement memorandum

(the "2006 PPM," Ex. 2). In connection with these offerings (the "Offerings"), Defendants

violated numerous federal securities laws by, *inter alia,* materially misrepresenting the value of

and risks associated with securities offered to investors while failing to comply with the

registration requirements imposed on parties marketing securities to the kinds of unaccredited

investors targeted by Defendants here.

This action is not about any minor oversight or a failure to fully explain to investors the

nature of an otherwise legitimate business. Rather, the Commission brings this action to protect

---

[1]     Ex. __ references are to documents submitted as part of the accompanying document
appendix (the "Appendix") of exhibits to the declarations of Edward Janowsky, an
accountant in the Commission's Broker-Dealer Inspection Program, and Terrence P. Bohan,
a Branch Chief at the Commission, executed on May 15, 2007 and May 16, 2007,
respectively.

investors from what appears to be an outright fraud through which Defendants have collected, and continue to solicit, large sums of money from investors (including at least three elderly people) on promises to own a part of a real estate investment company, while in fact the investors' money has been used, to the extent it has been utilized for real estate at all, only to purchase and renovate private homes for Defendants themselves. Because this appears to be an ongoing fraud, the Commission conducted only a limited investigation before deeming it necessary to seek judicial intervention. The evidence uncovered thus far, however, is compelling.

As set forth more fully below, Defendants' scheme relies upon unsolicited "cold-calls" to unaccredited investors marketing non-transferable interests in a real estate venture that Defendants boast is likely to provide investors with a windfall. In lieu of the audited financial statements that Defendants are required by Regulation D of the Securities Act of 1933 (the "Securities Act") to provide to investors, Defendants instead have sent investors a series of letters and marketing materials referring to business ventures that appear never to have existed, and for which the Commission has seen no evidence of future planning. Indeed, the only properties Defendants appear to have acquired with the money staked by EDG's unsuspecting investors are two private homes purchased in Straton's and Ayngorn's names – one of which Mr. Straton admitted publicly is to be used as his private residence (see Ex. 26 at 9), and the other of which was conveniently transferred to Ayngorn's wife (see Ex. 25), one additional step from investors' sight. In response to the Commission's questioning, Straton was unable to identify any property owned by the actual company in which investors believed they had purchased shares. Simply put, it appears that there is no legitimate business associated with the Fund or Company in which numerous individuals apparently invested more than a combined $1 million.

Furthermore, even if Defendants could demonstrate that EDG is something other than a scam, Defendants' failure to ever submit any registration statements for the securities it offered investors – in light of the unavailability of any exemption to the registration requirements associated with the sale of such securities – constitutes a *prima facie* violation of federal securities laws that justifies maintaining the *status quo* in order to allow Plaintiff to investigate whether EDG is something other than absolute fraud. Accordingly, Plaintiff respectfully requests that this Court grant Plaintiff's emergency application for relief, enjoining Defendants from continuing to violate federal securities laws and allowing for an accounting and freezing of Defendants' assets to protect investors' interests. Plaintiff further request that the Court order expedited discovery into Defendants' business to determine whether and to what extent a fraud is being perpetrated on EDG's investors.

## STATEMENT OF FACTS

### A.    Relevant Parties

EDG purports to be a Delaware limited liability company organized on October 15, 2004 as Castle Hill Ventures, LLC. (See Bohan Decl. ¶ 7.) According to its managing members, EDG exists as a real estate investment company. (See id. ¶ 13.) EDG's October 23, 2006 PPM states that Castle Hill changed its name to EDG on October 4, 2006. (Id. ¶ 7.) EDG's office is located at 1795 Coney Island Avenue, Brooklyn, New York, 11230. (Id.)

Felix Strashnov ("Straton") and Michael Ayngorn (the "Individual Defendants") are managing members of EDG and, according to Straton, EDG's only employees. (Id. ¶ 13.) Straton was sued by the New York State Attorney General's Office in July 1996 for fraud and misappropriation based on the offer and sale of stock of a defunct New Jersey corporation, and on September 4, 1996, Straton consented to a judgment enjoining him from engaging in

3

fraudulent practices and prohibiting him from offering, selling, or promoting any securities

within or from New York State until and unless full restitution was paid to defrauded investors.

(Id. at ¶ 10)

**B.    Defendants' Securities Offerings**

EDG has conducted at least two private placements.  The first, in November 2004 was

intended to raise $5 million through the sale of 100 units priced at $50,000 each.  (Janowsky

Decl. ¶ 8.)  EDG purported to sell "membership interests" in EDGFI through this placement.

The second placement, in October 2006, was devised to raise $25 million by the sale of 500 units

in EDG at a price of $50,000 per unit.  (Id.)[2]

1.    Defendants' Stated Intentions for the Use of Funds Raised Through Offerings

EDG issued private placement memoranda in connection with both its 2004 and 2006

private placements which purport to offer investors the opportunity to participate in the real

estate market by purchasing units in a fund that will be used to "acquire a portfolio of single and

multi-family attached residential real estate properties including underdeveloped parcels for

development, renovation or rehabilitation . . . and ultimately for resale." (Bohan Decl. ¶ 26)  The

2004 and 2006 Private Placement Memoranda represent that EDG will use the offering proceeds

to conduct (i) real estate market research and project feasibility studies, (ii) the acquisition of raw

land and improved parcels, (iii) development expenses, including without limitation legal

services, architectural services, engineering services, building materials, building contractor

services and other labor, and finance-related costs, (iv) liability and other insurance premiums,

---

[2]    As Defendants' placement memoranda do not fully explain the relationship between EDG
and EDGFI, for purposes of this brief, investments in EDG and EDGFI are identified
collectively as investments in EDG or the "Securities" unless otherwise specified.

(v) unit marketing expenses, and (vi) general working capital including salaries payable to the chief executives (Straton and Ayngorn). (Id. ¶ 27)

    2.    <u>Defendants' *Actual* Use of Funds Raised Through Offerings</u>

On May 1, 2007, representatives from the Commission interviewed Straton at EDG's office regarding the Company's marketing of its securities and the use of funds generated therefrom. (Bohan Decl. ¶ 10)  By this time, more than two years had passed since EDG began collecting money through its 2004 Offering.  In response to questioning by the Commission, Straton estimated that between 50 and 100 individuals had invested a total of $1.2-$1.5 million through EDG's first private placement. (Id. ¶ 14)  Nevertheless, Straton could not point the Commission to any properties purchased in the Company's name. (See id. ¶¶ 18-20.)

Straton told the staff that EDG has acquired only two properties since the Company's inception – both of which are ongoing projects – but Straton stated that these two properties had been purchased in Straton's and Ayngorn's respective names – not EDG's name.  The first property is located at 2 Harris Place, Fairlawn, New Jersey.  Straton stated that the property was purchased in his name, rather than EDG's, because EDG had not established any credit history, and therefore would not be able to secure financing at a favorable rate. (See id.)

Straton showed the Commission an architect's blueprints for the property located in Fairlawn.  The blueprints were titled "Strashnov Residence." (Id. at ¶ 18)  After the interview, the staff obtained minutes of a zoning board meeting for the town of Fairlawn at which Straton applied for a variance for the Fairlawn property.  Straton advised the zoning board that he intended to live in the property. (Id. at ¶ 36)  Thus, it appears that Straton has used investor money to buy and remodel the Fairlawn property for his own personal use. (See id. at ¶¶ 18, 35.)

The second property that was apparently acquired using money raised from individuals' investments in EDG was purchased in Ayngorn's name. Property records from the City of New York indicate that Ayngorn has transferred title of this property to his wife, further obfuscating how this property will benefit EDG's investors. (Id. at ¶¶ 35.) The property was purchased for $635,000 and immediately mortgaged for $600,000, leaving little equity. (See id. at ¶ 34.)

The Commission has spoken to two EDG investors and the son of a third investor who is now in a nursing home suffering from, among other things, dementia. The Commission has also reviewed EDG's placement memoranda and communications to those investors. These investors were informed that the funds invested in EDG would be used to purchase property for the Company, not for the Individual Defendants. (See Janowsky Decl. ¶ 10.) As for the remainder of funds collected by EDG, Straton stated that most of that money had been used for general "work money" and "for running the business." (Bohan Decl. ¶ 14) When asked to elaborate, Straton stated the funds were used for sub-contractors, architects and salaries. (Id.) Straton conceded that EDG has not made any payments to any investors. (Id.)

### 3. Defendants' Improper Solicitation of Investors

Straton told the Commission that he identified investors through personal relationships, marketing campaigns and marketing companies. (Bohan Decl. ¶ 16) According to Straton, the Company relied upon marketing companies to generate a list of individuals the marketing company would then contact. (Id. at ¶¶ 16, 17) If individuals indicated they were interested in receiving a package about investing in real estate they would be sent a package about EDG, and, according to Straton, would contact EDG in order to invest. (Id. at ¶ 16)

In the course of its May 1, 2007 visit to EDG's office, the Commission's broker-dealer inspection staff observed numerous indicia of an operating "boiler room," suggesting EDG's

solicitation methods were focused on a large cold-calling operation. (Id. ¶ 13)  The staff

observed a large room consisting of at least eight large desks and four perimeter offices with

glass doors.  The staff noted various brokerage/sales related documents in the office including

the following:  (a) EDG business cards taped to the phones or near the phones; (b) hundreds of

lead cards; (c) an apparent sales script; (d) numerous small maps containing the U.S. time zones;

(e) EDG correspondence to investors; (f) an apparent investor contact list containing handwritten

notes, such as "left message" and "not interested"; (f) two versions of EDG private placement

memoranda; and (g) a box of professionally printed color brochures featuring EDG.  (Id.)

      4.      The Defendants' Misrepresentations to Investors

Interviews with two EDG investors – James Milligan, age 79 and William Kolb,

age 93 – confirmed EDG's cold-call approach to soliciting investors.  (See Janowsky Decl. ¶ 7.)

Moreover, interviews with and documents collected from Milligan and Kolb – who were

persuaded to invest approximately $12,000 and $40,000, respectively, despite both individuals'

explanations to EDG's representatives that they were not wealthy and that such significant

investments would be difficult for them (see id. ¶¶ 4, 5, 7) – disclosed numerous material

misrepresentations reflecting what appears to be actionable securities fraud.

Milligan and Kolb provided the Commission with copies of shareholder letters they

received from EDG containing misrepresentations and numerous misleading statements.  For

example, a November 2, 2005 letter to shareholders states that:

> EDG is very pleased to announce that the company has registered
> with the Securities and Exchange Commission as well as filing
> with the New York State Securities Investor Protection & Real
> Estate Financing Bureau. . . . .  These registrations are the first
> major step to allow EDG to achieve Public Market status for the
> company's shares.

(Id. ¶ 37)

Shortly thereafter, on November 28, 2005, EDG sent investors a sheet titled "Instructions to view SEC Filings" that provides the EDGAR link to EDG's notice to sell shares under Regulation D. (Id. ¶ 38) A Regulation D notice is not a registration statement but simply a notice of the sale of private placement stock. The notice appears intended to deceive potential and existing shareholders by creating support for the representation that EDG expects to achieve "Public Market" status. At least two other shareholder letters contain similar misrepresentations. A January 5, 2007 letter states that "EDG has also started the process that will ultimately see our shares registered and listed with the Securities and Exchange Commission (SEC)," (id. ¶ 53), while a letter received on or about September 8, 2005 states:

> The company has formulated plans to register the Empire Development Group (EDG) Real Estate Fund with the Securities and Exchange Commission (SEC). By becoming a publicly reporting company we will allow Investors complete financial transparency with audited financials. Also, by achieving reporting company status we take the next step forward to potentially becoming a publicly traded company....

(Id. at 36)

When the Commission questioned Straton about his plans for the Company on May 1, he stated: "Of course, it would be my dream to take the company (EDG) public." (Bohan Decl. ¶ 21) But Straton acknowledged that he is not close to achieving that dream. (Id.) Indeed, a review of the Commission's public records fails to turn up any filings by EDG relating to a possible initial public offering. (Id. ¶ 22) Straton said the first step for the Company would be to get into the "black" by selling the properties they have acquired, and added that EDG has not generated any revenues, and that without the sales of the currently held properties, EDG will remain in the "red." (Id. ¶ 21) These facts were unknown to both Kolb and Milligan when they were persuaded to invest in EDG in part because they believed, based on Defendants'

8

representations, an initial public offering was imminent and they would be able to sell their units at a profit. (Janowsky Decl. ¶¶ 26, 29)

The shareholder letters also contain numerous misleading statements designed to make an investor believe that EDG is a safe investment. For example, Ayngorn sent a letter to investor Milligan stating EDG "has structured its Fund to allow Investors the opportunity to receive every penny of their investment back, then continue on to receive income distributions of net proceeds for the life of the fund." (Janowsky Decl. ¶ 30)

Similarly, the shareholder letters contain baseless projections regarding EDG's ability to obtain financing, acquire and develop real estate projects and generate profit. The representations are phrased in such a way as to suggest that the events are imminent. For example, one letter states: "Management is currently in negotiations with corporate counsel to achieve a large financial infusion thru *Pipeline Financing*, utilizing some of the financial communities (sic) biggest names." (Janowsky Decl. ¶ 54). Another states: "Plans for an additional round of financing are currently underway, which from inception is expected to be 50 million dollar offering. Management is expecting the majority of the share allocations going to institutional investments." (Id. at ¶ 46) And yet another boasts that "following the completion of EDG's 5 Million dollar Fund I Equity Financing, Management projections for Gross Revenue are expected to exceed 40 Million dollars within the next 5 years…." (Id. ¶ 37) Noticeably absent from the Company's communications with investors were any financial statements supporting its claims, which Straton admitted to the Commission EDG has never created. (Bohan Decl. ¶ 21)

Discussing the price of properties that EDG does not own, another letter states "these price ranges allow us to achieve profit margins in excess of 400-600 thousand dollars per project.

Achieving a return on investment dollar of 75-125 percent (sic)."  (Janowsky Decl. ¶ 46)  And

yet another letter states: "[W]e feel that Development Projects will be much more profitable

with conservative expected Return On Investment of 150-300% or better.  We feel that our

expected Revenue growth should exceed $18-21 Million within 36 months of commercial

operations, while achieving Working Capital in excess of $9-12 Million in that same time

period."  (Id. ¶ 22)

But the Company's real predicament as confessed to the Commission by Straton belies

the Company's apparent misrepresentations to its potential and actual investors.  As described

above, Straton told the Commission's examination staff that EDG is operating "in the red" and

does not have financial statements.  (See Bohan Decl. ¶ 21.)  It is highly unlikely that EDG was

in negotiations with anyone for financing without the ability to present even the most basic

information conveyed in financial statements.  Moreover, Straton conceded that the only two

properties EDG ever purchased are the private residences purchased in the Individual

Defendants' names.  (Id. ¶ 18)  Even if these properties are sold at a profit (and ignoring the fact

that the properties are not even in EDG's name), it is difficult to foresee such sales generating

revenues in the millions of dollars as claimed in the letters.

Finally, the PPMs for both private placements include misstatements that not only appear

to constitute fraud themselves, but also highlight Defendants' failure to comply with the

registration requirements set forth in Section 5 of the Securities Act.  Defendants claim in the

PPMs that the sales of EDG securities (the "Securities") are exempt from registration under

Section 4(2) of the Securities Act and Rule 506 of Regulation D.  (Bohan Decl. ¶ 26)  As

explained below, however, the exemptions Defendants reference in the PPMs are not available to

the Company because, among other reasons, it appears that Defendants failed to provide

investors with the requisite financial and other information required to qualify for an exemption when marketing to unaccredited investors. In fact, the investors with whom the Commission staff spoke did not even receive the PPMs until <u>after</u> they had already made their initial investments in EDG. (<u>Id.</u> ¶ 25)

## ARGUMENT

I.    **DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Because the Commission is "not … an ordinary litigant, but … a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. <u>SEC v. Management Dynamics, Inc.</u>, 515 F.2d 801, 808 (2d Cir. 1975). The Commission need not show irreparable injury or a balance of equities in its favor. <u>Id.</u>; <u>see also</u> <u>SEC v. Unifund SAL</u>, 910 F.2d 1028, 1035 (2d Cir. 1990). Rather, the Commission is entitled to entry of temporary and preliminary injunctive relief against future securities law violations upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." <u>See</u> <u>SEC v. Cavanagh</u>, 155 F.3d 129, 132 (2d Cir. 1998) ("<u>Cavanagh I</u>"); <u>see also</u> <u>Unifund SAL</u>, 910 F.2d at 1039-40.[3]

Here, the Commission easily makes a "substantial showing" that (i) the Defendants have committed current violations of the antifraud and registration provisions of the federal securities laws; and (ii) there is a present risk that the Defendants will repeat their conduct by continuing the fraud alleged in the Complaint. In connection with fraudulent sales of unregistered securities, Defendants have made egregious material misstatements about EDG, have failed to

---

[3]    The Commission also is relieved of demonstrating the lack of an adequate remedy at law, as private litigants must, to obtain an injunction. <u>Cavanagh I</u>, 155 F.3d at 132; <u>see also</u> <u>SEC v. Scott</u>, 565 F. Supp. 1513, 1536 (S.D.N.Y. 1983), <u>aff'd sub nom.</u>, <u>SEC v. Cayman Islands Reins. Corp.</u>, 734 F.2d 118 (2d Cir. 1984).

11

provide the audited financial statements required by the federal securities laws, and have

deceived, and continue to deceive, EDG's investors. Notably, Defendants' violations of the

federal securities laws exhibit a high degree of scienter which, though a requisite element of only

certain of the securities law violations discussed herein, demonstrates why injunctive relief is

necessary to prevent such knowing and deliberate deception of investors from continuing. Given

the nature of these violations and potential for Defendants to ensnare new victims, a temporary

restraining order is warranted to preserve the status quo pending a preliminary injunction

hearing.

### A. The Defendants Have Committed Violations of the Federal Securities Laws by Defrauding Investors in Connection With Unregistered Sales of Securities

    1.      Defendants have violated Sections 5 and 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5.

Defendants' fraudulent sales of unregistered securities are actionable under the anti-fraud

provisions of both the Securities Act of 1933, 15 U.S.C. § 77 ("Securities Act") and the

Securities Exchange Act of 1934, 15 U.S.C. § 78 ("Exchange Act"). Section 17(a) of the

Securities Act prohibits fraud in the offer or sale of securities. Section 10(b) of the Exchange

Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of

securities. See United States v. Naftalin, 441 U.S. 768, 772, 778 (1979). To establish a violation

Section 10(b) of the Exchange Act and Rule 10b-5, the Commission must show i) a

misrepresentation or omission regarding material facts or other fraudulent conduct, ii) made with

scienter, iii) in the offer or sale, or in connection with the purchase or sale, of a security. See

Basic, Inc. v. Levinson, 485 U.S. 224, 235 n.13 (1988) (citation omitted). A statement or

omission is material if a reasonable investor would view its disclosure as significantly altering

the 'total mix' of information made available." See also TSC Industries v. Northway, Inc., 426

U.S. 438, 449 (1976). The requirement under Section 10(b) and Rule 10b-5 that a fraud be

perpetrated "in connection with" the sale of securities is satisfied when the fraud touches the sale

of securities. <u>Superintendent of Ins. v. Bankers Life & Cas. Co.</u>, 404 U.S. 6, 12-13 (1971).

Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5

also require proof of scienter.[4] Scienter is "a mental state embracing intent to deceive,

manipulate, or defraud." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 (1976). Knowing or

reckless conduct satisfies the scienter requirement. See <u>SEC v. U.S. Envtl.</u>, 155 F.3d 107, 111

(2d Cir. 1998); <u>Rolf v. Blyth, Eastman Dillon & Co., Inc.</u>, 570 F.2d 38, 44-48 (2d Cir. 1978).

Proof of scienter can be inferred from circumstantial evidence. <u>Herman & MacLean v.

Huddleston</u>, 459 U.S. 375, 390-91 n.30 (1983). Since corporate defendants are not capable of

possessing a mental state, for purposes of establishing scienter, the state of mind of their agents

is imputed to them. See <u>SEC v. Interlink Data Network of Los Angeles, Inc. et al.</u>, 1993 U.S.

Dist. LEXIS 20163, *44 (C.D. Cal., November 15, 1993) (citing cases).

Defendants made material misrepresentations to at least the two investors interviewed by

the Commission staff. These misrepresentations offer compelling evidence of scienter. For

example, in shareholder letters and in telephone communications with investors initiated to

induce investors to purchase units in EDG, Defendants made the following material

representations:

- EDG had registered with the Commission;

- an IPO was imminent;

- EDG was in negotiations to obtain financing from institutional investors;

---

[4]    A showing of negligence is sufficient to establish a violation of Sections 17(a)(2) and
17(a)(3) of the Securities Act. See <u>Aaron v. SEC</u>, 446 U.S. 680, 696-97, 701-02 (1980).

- EDG was close to purchasing and developing properties that would generate significant profits, and

- investors would receive their entire investment back.

(See Janowsky Decl. ¶¶ 26, 29, 30, 31, 37, 46, 54)

In fact, EDG had not registered with the Commission; appears to have taken no significant steps toward any IPO of EDG shares (in fact, as recently as May 1, 2007, Straton characterized an EDG IPO as a "dream" and admitted that the Company was not close to achieving that dream); relies on unaccredited, individual investors for funding; never was close to purchasing or developing properties other than two private residences intended for the Individual Defendants' private use; and refused to return the investment of at least one investor who made such a request. (See Janowsky Decl. ¶ 52, Bohan Decl. ¶ 21)

The misrepresentations and omissions outlined above are "material" because there is a substantial likelihood that a reasonable investor would consider such information important in making an investment decision. Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). For example, a reasonable investor would find important Defendants' representations that a public market would soon exist for EDG stock. See SEC v. Hasho, 784 F. Supp 1059, 1109 (S.D.N.Y 1992) (statements about a future IPO and baseless price predictions violate the antifraud provision of the federal securities laws even when posed as opinion or possibility rather than as a guarantee). And a reasonable investor would undoubtedly consider important Defendants' apparent plan to use investors' funds to finance their own private residences.

Defendants' actions betray an intentional fraud, not merely accidental misstatements or omissions, which makes Defendants' securities violations particularly egregious and, in turn, the need for judicial intervention more urgent. Scienter is a mental state embracing intent to deceive, manipulate, or defraud. Ernst & Ernst, 425 U.S. at 193. The Second Circuit has held

14

that reckless conduct generally satisfies the scienter requirement. See, e.g., SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998) (holding that scienter required for a Section 10(b) or Rule 10b-5 claim "may be established through a showing of a reckless disregard for the truth"), citing Rolf, 570 F.2d at 46; Sirota v. Solitron Devices, Inc., 673 F.2d 566, 573 (2d Cir. 1982).

While recklessness is sufficient to sustain the Commission's claims, the evidence in this case goes beyond mere recklessness. Indeed, the blatant falsity of statements included in the placement memoranda, letters and other communications to investors highlights the intentional nature of the Defendants' deception. Whereas investors were told of a company that was on the brink of making numerous real estate investments, Straton was unable to identify for the Commission a single property purchased by EDG in the Company's name. When asked about the logic behind using Company funds to purchase property that was not held in the Company's name, Straton maintained that the Company had not yet achieved an adequate credit rating to purchase the properties. This answer is problematic for several reasons: First and foremost, investors were never told that properties would be placed in Straton's and Ayngorn's names – they were told of investments that would be made by and for the company, EDG, in which the investors were risking their money. Second, a company whose business plan is entirely based on a plan to invest in real estate should have the means to do so – if it does not, this is certainly information that a reasonable investor would want available as part of the total mix of information. Furthermore, and perhaps presenting the brightest red flag of all, Defendants are extremely unlikely to have had any legitimate business purpose for transferring property to Ayngorn's wife, an act made all the more suspicious by Defendants' failure to inform its investors of the transfer.

The Commission has significant concerns that absent Court intervention, other investors will be harmed and money will be dissipated. Straton admitted to the Commission's staff that Defendants have very little money left of the funds raised thus far. While one letter to investors promised that if they so needed, investors could get their money back from EDG, when the son of one elderly investor asked for a return of his father's investment, he was rebuffed. (Janowsky Decl. ¶ 52)

Additional evidence of this apparent fraud abounds. As noted above, before orchestrating the sale of EDG securities, Straton was sued by the New York State Attorney General's Office in July 1996 for fraud and misappropriation in connection with the offer and sale of stock of a defunct New Jersey corporation. (Bohan Decl. ¶ 10) On September 4, 1996, Straton consented to a judgment enjoining him from engaging in fraudulent practices and prohibiting him from offering, selling, or promoting any securities within or from New York State until and unless full restitution was paid to defrauded investors. (Id.) As courts in this Circuit have held repeatedly, this is precisely the kind of information that a reasonable investor would want to know as part of the total mix of available information when considering whether to invest in a company like EDG. See, e.g., Breard v. Sachnoff & Weaver, Ltd., 941 F.2d 142, 144 (2d Cir. 1991) ("[F]ailure to mention [partnership's counsel's] conviction in the initial offering memorandum could be considered reckless as a matter of law."); S.E.C. v. Electronics Warehouse, Inc., 689 F. Supp. 53, 66-67 (D. Conn. 1988), aff'd, 891 F.2d 457 (2d. Cir. 1989) (discussing the importance of the disclosure of a criminal action against the president of a company despite the president's belief the indictment would be dismissed). But the Commission has found no mention of Straton's run in with the law – more specifically, *securities law* – in any of the letters or memoranda sent by Defendants to potential or actual investors.

Defendants' responses to the Commission on May 1 further suggest that EDG is a scam. Straton insisted that investors were identified through specific contacts and a marketing campaign, but investors have testified they were "cold-called" by people with whom they had never conducted any business, and the appearance of Defendants' offices support those investors' claims, as the Commission found what appeared to be a "boiler room" with phone banks and what appeared to be call lists. Plaintiff's requested relief is targeted specifically toward preserving the *status quo* so that Defendants cannot continue to seduce new investors with false promises and cannot continue to take the kinds of steps like moving investments into spouse's names that will make recovering existing investors' money more difficult.

2.     The Defendants have violated Sections 5(a) and 5(c) of the Securities Act
       by offering and selling securities in unregistered transactions

Defendants are offering securities without a registration statement or other applicable exemption to unsophisticated investors, violating Sections 5(a) and 5(c) of the Securities Act of 1933. "Section 5 requires that securities be registered with the SEC before any person may sell or offer to sell such securities." SEC v. Cavanagh, 445 F.3d 105, 111 (2d Cir. 2006) ("Cavanagh II"). "To state a cause of action under Section 5, one must show '(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale.'" Id., quoting Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 124 n. 4 (2d Cir.1998).

The Complaint, the Bohan Declaration and the Janowsky Declaration plainly establish all three elements. First, the Commission has not received any communication from Defendants reflecting even an attempt to register, let alone a valid, executed registration statement covering

17

the Securities.  Though scienter is not an element of a Section 5 cause of action, it warrants

mentioning that Defendants here are undoubtedly aware that securities must be registered, as

evidenced by their inaccurate claim to an "exemption" to the Securities Act's registration

requirements.[5]

Second, it is indisputable that the instruments offered by Defendants constitute

"securities" as contemplated by the Securities Act.  A security under both Section 2(a)(1) and

3(a)(10) is defined as, inter alia, "any note, . . . evidence of indebtedness, . . . [or] investment

contract."   The term is to be defined broadly to effectuate Congress' intent to capture all the

kinds of investment vehicles that those who defraud can think up:

> [Congress] recognized the virtually limitless scope of human ingenuity,
> especially in the creation of "countless and variable schemes devised by
> those who seek the use of the money of others on the promise of profits" .
> . . . Congress therefore did not attempt precisely to cabin the scope of the
> Securities Acts.[footnote omitted] Rather, it enacted a definition of
> "security" sufficiently broad to encompass virtually any instrument that
> might be sold as an investment.

Reves v. Ernst & Young, 494 U.S. 56, 65-66 (1990) (quotations omitted).[6]  Indeed,

Defendants themselves described the interests available to investors as "securities" on the

---

[5]   Remarkably, Defendants attempted to solicit investors by boasting, that "EDG has also
started the process that will ultimately see our shares registered and listed with the Securities
and Exchange Commission (SEC)."  (Janowsky Decl. ¶ 53)  The very feature Defendants
were highlighting as making an investment in Empire attractive – namely, the potential that
investors could own *registered* securities along with the benefits attendant thereto – was
conspicuously absent from the securities Defendants were marketing to its investors.

[6]   That the investors were offered a share of a limited partnership does not, for purposes of a
Section 5 analysis, change the nature of the product offered by Defendants.  Limited
partnership units are securities.  Mayer v. Oil Field Systems Corp., 721 F.2d 59, 65 (2d Cir.
1983) ("under the test whether an investment contract is a security established in SEC v. W.J.
Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946), a limited
partnership interest generally is a security because such an interest involves investment "in a
common enterprise with profits to come solely from the efforts of others." Id.; see also SEC
v. Aqua-Sonic Products Corp., 687 F.2d 577, 581-84 (2d Cir.).

cover of both their November 2004 and October 2006 offering memoranda (see Exs. 1

and 2 in Appendix accompanying Janowsky and Bohan Declarations) and admitted to the

sale of such securities when confronted by the Commission. (Bohan ¶¶ 14, 15).

Finally, the means by which Defendants communicated with the investors – the

interstate mail though which Defendants solicited investors' funds and the interstate telephone

calls used for the same purpose (Janowsky Decl. ¶¶ 13, 14) – leave no doubt that the third

element of a Section 5 cause of action is satisfied in this case.

3.    Defendants are Not Exempt from Sections 5(a) and 5(c)

"Once a prima facie case has been made, the defendant bears the burden of proving the

applicability of an exemption." Cavanagh II, 445 F.3d at 11 n.13 (citation omitted). No such

exemption applies for Defendants here. See 15 U.S.C. § 77d (listing circumstances, inapposite

here, under which a party may be exempt from Section 5).

Defendants declare in both the 2004 and 2006 PPMs that Defendants' sales are exempt

from registration under Section 4(2) of the Securities Act of 1933 ("Securities Act") and Rule

506 of Regulation D. (Bohan Decl. ¶ 26) The problems with this claim are manifold. First, to

"qualify for exemption under this section [506], offers and sales must satisfy all the terms and

conditions of §§ 230.501 and 230.502." SEC Reg. §230.506(b)(1). Among other requirements,

SEC Reg. §230.502 requires parties seeking an exemption from the registration requirements of

Section 4(2) of the Securities Act to provide unaccredited investors with specific information,

including financial statements, that Defendants did not provide.[7]

---

[7] Rule 501 of Regulation D defines the term accredited investor. The definitions relevant to
    individual investors are:

    1.  a director, executive officer, or general partner of the company selling the securities;

Additionally, Rule 506 requires that "[e]ach purchaser who is not an accredited investor either alone or with his purchaser representatives has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description." SEC Reg. §230.506(b)(2)(ii). The Commission asked Defendants how they identified potential investors for the Securities and Defendants failed to offer any information suggesting that Defendants had any idea whether the unaccredited investors targeted by Defendants' cold calls were sufficiently knowledgeable to satisfy this condition. (Bohan Decl. ¶¶ 16, 17) Defendants cannot rely here on statements or warnings included in the PPMs, as even if those documents did include language relating to some registration exemption – and, to be clear, it does not appear that anything in the PPMs would save Defendants on this count – investors with whom the Commission staff spoke made their initial investments in EDG before they even received the PPMs. (Bohan Decl. ¶ 25)

Defendants' sales and solicitations also do not appear to have complied with Rule 506(b)(2)(i), which only provides for an exemption to certain registration requirements where the number of purchasers of securities does not exceed 35. Here, the average investment that would be required for 35 or fewer investors to fully purchase the $25 million worth of shares offered in 2006 was well beyond the means of investors like those the Commission interviewed who struggled to pull together tens of thousands of dollars, let alone several hundred thousand dollars.

---

2. a natural person who has individual net worth, or joint net worth with the person's spouse, that exceeds $1 million at the time of the purchase; or

3. a natural person with income exceeding $200,000 in each of the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year.

Nor does Section 4(2) apply. Four factors are relevant in deciding whether the Section 4(2) private placement exemption applies: (1) the number of offerees; (2) the sophistication of the offerees; (3) the size and manner of the offering; and (4) the relationship between the issuer and the offerees. See SEC v. Murphy, 626 F.2d at 644-45. The focus of this inquiry is to examine the need of the offerees for the additional protection afforded by registration, such as the need of the offerees to have access to the additional information that would be available in a registration statement. See SEC v. Ralston Purina Co., 346 U.S. at 127. It appears that EDG conducted a general solicitation to unsophisticated, elderly investors – apparently accepting investments before even providing PPMs, let alone the more specific financial and other information Defendants were required to provide (Bohan Decl. ¶ 25) – thus rendering an exemption under Section 4(2) unavailable.

In sum, Defendants can offer no support for an exemption to the Securities Act's registration requirements under Section 4(2), Rule 506 or any other provision. As such, Defendants' marketing and sale of unregistered securities is a violation of federal securities law that must be enjoined forthwith.

### B.   The Defendants Are Likely to Continue Their Illegal Conduct

In determining whether to grant emergency relief, courts consider whether there is a reasonable likelihood that the defendant will again engage in illegal conduct. Cavanagh I, 155 F.3d at 135. In assessing that likelihood, courts consider such factors as the "isolated or recurrent nature of the infraction," the degree of scienter involved, and whether future violations may occur because of defendant's occupation. See, e.g., id.; SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 100-01 (2d Cir. 1978); SEC v. Management Dynamics, Inc., 515 F.2d at 807.

In this case, the scheme is ongoing, and the scienter is striking. Accordingly, emergency relief is appropriate.

## II. THE COURT SHOULD GRANT ADDITIONAL RELIEF TO FACILITATE THE PRESERVATION OF INVESTOR ASSETS AND PROSECUTION OF THE CASE

The Court should order an asset freeze and a verified accounting to preserve and identify investor assets. The Court should also order expedited discovery and prohibit the destruction of documents and witness tampering to allow for the efficient and just prosecution of this action.

### A. The Court Should Enter an Asset Freeze

It is well-established that a court has the authority in securities fraud cases to grant ancillary relief, such as asset freezes, in order to preserve funds necessary to satisfy any final judgments a court may enter compelling, for example, the disgorgement of profits or civil penalties. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103, 1105-06 (2d Cir. 1972). In fact, the showing needed to warrant an asset freeze is lesser than that required to support an injunction. See, e.g., Unifund, SAL, 910 F.2d at 1041 (court upholding asset freeze, despite finding insufficient basis to enter preliminary injunction). Where there are concerns that defendants might dissipate assets, a court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. Id.; see also SEC v. Infinity Group Co., 212 F.3d 180, 197 (3d Cir. 2000) (purpose of asset freeze is to preserve status quo by preventing dissipation and diversion of assets).

In this case, dissipation is at the heart of the Commissions concerns, as Defendants have already demonstrated a willingness to at best commingle, and at worst, fraudulently transfer, investors' money for the purpose of acquiring private property in the Individual Defendants' names. Accordingly, the Court should grant an asset freeze over the assets of the Defendants to protect investors from the further dissipation of the Company's assets.

## B. The Court Should Order an Accounting

Courts also may impose the equitable remedy of a sworn accounting to provide an accurate measure of the whereabouts of the proceeds of an offering. SEC v. Bremont, 954 F. Supp. 726, 733 (S.D.N.Y. 1997) (granting accounting prior to evidentiary hearing); see generally Manor Nursing, 458 F.2d at 1105; see also Exchange Act Section 21(d)(5) (codifying Section 305 of the Sarbanes-Oxley Act, which provides that "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors"). Given that Defendants claim to have raised well in excess of $1 million, we need to understand how the money was spent and where the assets may be located.

## C. The Court Should Enter an Order Permitting Expedited Discovery and Prohibiting the Destruction of Documents

The Court should grant the Commission's request for expedited discovery in order to allow the Commission to act quickly to obtain bank and other records necessary to locate, identify and preserve investor assets and determine whether the Defendants are engaged in other ongoing frauds.[8] Likewise, the Court should enter an order prohibiting the Defendants from destroying and altering documents in order to preserve as much of the evidence as possible given the Defendants' continuing misconduct.

---

[8] In light of the Commission's need to continue conducting discovery in order to locate the Company's assets, the Commission requests an order expediting discovery that will remain in place beyond any hearing or application for preliminary injunctions.

## CONCLUSION

For the foregoing reasons, and those set forth in the accompanying Declarations

and exhibits, the Commission respectfully requests that its application be granted.

Dated: New York, NY
     May 18, 2007              Respectfully submitted,

                              By: _Doria G. Stetch_

                              Mark K. Schonfeld (MS-2798)
                              Doria G. Stetch (DS-3307)
                              ATTORNEY FOR PLAINTIFF
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              3 World Financial Center
                              New York, New York 10281
                              (212) 336-1020

Of Counsel:

Andrew M. Calamari
Meaghan Cheung
Michael Birnbaum
Michael Paley