Counsel of Record:
Mark K. Schonfeld (MS-2798)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-1020
(212) 336-1322 (fax)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**          :
                                                 :
        **Plaintiff,**                    :
                                                 :
    -against-                               :
                                                 :          **07 Civ.      (    )**
**EMPIRE DEVELOPMENT GROUP, LLC,**               :
**EMPIRE DEVELOPMENT GROUP FUND I, LLC,**        :
**CASTLE HILL VENTURES, LLC,**                   :
**FELIX STRASHNOV a/k/a FELIX STRATON and,**     :
**MICHAEL AYNGORN,**                             :
                                                 :
        **Defendants.**                   :
                                                 :

------------------------------------------------------------------------x

**DECLARATION OF EDWARD JANOWSKY IN SUPPORT OF**
**PLAINTIFF'S EMERGENCY APPLICATION FOR TEMPORARY**
**RESTRAINING ORDER, PRELIMINARY INJUNCTION, ASSET FREEZE,**
**ORDER TO SHOW CAUSE, AND OTHER RELIEF**

I, Edward Janowsky, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am over 18 years of age and am employed as a staff accountant in the Broker/Dealer

Inspection Program in the Securities and Exchange Commission's New York Regional Office. I

have been employed at the Commission for over eight years. I make this Declaration in support

of the Commission's Emergency Application for Temporary Restraining Order, Asset Freeze,

Preliminary Injunction, Order to Show Cause, and Other Relief (the "Application") against Felix

Strashnov, a/k/a Felix Straton, Michael Ayngorn, Empire Development Group, LLC ("EDG"),

Empire Development Group, Fund I LLC ("EDGFI") and Castle Hill Ventures, LLC.

2.      This Declaration is based on interviews of two EDG investors that I conducted along with other Commission staff.  The staff interviewed James Milligan on April 23, 2007 and May 9, 2007.  The staff interviewed William Kolb on April 23, 2007 and May 8, 2007, and also interviewed Kolb's son, Robert Kolb, on those days.   This Declaration is also based on my review of documents provided to the Commission staff by Kolb and Milligan, and on my interview of Kenneth Banks, the son of an EDG investor, on April 24, 2007.

3.      The statements of others set forth herein are described in substance and in part, and not verbatim.  To the extent that there are assertions herein concerning dates and numbers, they are approximate, based upon information and evidence gathered to date.  Because the Commission submits this Declaration for the limited purpose of supporting this Application, I have not set forth each and every fact that I know about the investigation.

4.      William Kolb told the staff that he is a 93 year-old retiree, living on a fixed income in Toms River, New Jersey.   He stated that he had invested a total of about $12,000 with EDG.

5.      James Milligan told the staff that he is 79 years old and lives in Monticello, Indiana.  He stated that his annual income is about $75,000 and his net worth is around $300,000.  Milligan stated that he invested about $50,000 with EDG.[1]

6.      Kenneth Banks told me that his father, William Banks, invested with EDG.  Kenneth Banks also told me that his father is 86 years old, has Parkinson's Disease and dementia, and resides in an assisted living facility in Pennsylvania.

**EDG's Initial Contacts with Kolb and Milligan and the PPMs.**

7.      Kolb and Milligan both told the staff that they were initially contacted by EDG by

---

[1]     The staff has not yet been able to establish definitively the exact date and amount of each portion of Kolb's and Milligan's investments with EDG.

telephone, and had no previous connection with EDG or the person who contacted them. Both investors recalled telling the caller that they had little money to invest. And both investors were ultimately persuaded by the caller to invest as much money as they could.

8.      Both investors recalled that, at the time they made their initial investment with EDG, they had not yet received any private placement memorandum ("PPM"). Milligan eventually received two PPMs. The first PPM, dated November 1, 2004, concerned a purported $5 million offering for Empire Development Group Fund I ("EDGFI").[2] The second PPM, dated October 23, 2006, concerned a purported $25 million offering for EDG.[3] Kolb recalled receiving the second PPM and was uncertain whether he had ever received the earlier PPM.

9.      The November 1, 2004 PPM represented that EDG would use the offering proceeds for "(i) cash investments in foreclosure-related investment properties, property rehabilitation construction costs, and related capital improvements, together with associated legal fees and closing costs, (ii) property casualty and liability insurance premiums, (iii) real estate market research and related foreclosure marketing expenses, and (iv) general administrative and overhead expenses of [EDGFI], including an annual management fee payable to [EDG], salaries payable to the [the] Managing Directors, and Fund-related legal and accounting fees, including those associated with this Offering."

10.     The November 1, 2004 PPM also represented, among other things:

> Our plan is to identify investment-worthy properties that we determine to be located in neighborhoods or areas in which we believe property values . . . are generally rising, acquire them on favorable terms, renovate them if necessary, and either sell them as quickly as possible, or, if not already leased, lease them . . .
>
> We expect to acquire fee simple title to each of our investment properties . . . , either directly or through special purpose entities that we establish for that

---

[2]      A copy of the first PPM is included in the accompanying appendix as Exhibit 1.

[3]      A copy of the second PPM is included in the accompanying appendix as Exhibit 2.

purpose. Such fee interest may be held by us alone or together with one or more joint venture partners with whom we have determined to jointly invest or otherwise participate. . . .

11.    Similarly, the October 23, 2006 PPM represented that EDG would use the offering proceeds for "(i) real estate market research and project feasibility studies, (ii) the acquisition of raw land and improved parcels, . . . (iii) development expenses, including without limitation legal services, architectural services, engineering services, building materials, building contractor services and other labor, and finance-related interest and costs, (iv) liability and other insurance premiums, (v) unit marketing expenses, and (vi) general working capital, including salaries payable to [the] executive officers."

12.    The October 23, 2006 PPM also offered investors the opportunity to participate in the real estate market by purchasing units in a fund that will be used to "acquire a portfolio of single and multi-family attached residential real estate properties including underdeveloped parcels for development, renovation or rehabilitation . . . and ultimately for resale."

**EDG Repeatedly Persuaded Kolb and Milligan to Invest
by Means of Numerous Phone Calls and Letters.**

13.    Kolb and Milligan also stated that, during the past two years, they had received numerous other mailings from EDG (which they provided to the staff), and had received numerous phone calls from various EDG salesman soliciting additional investments.

14.    Both investors stated that they were persuaded by the letters and phone calls from EDG to increase their investments on a number of occasions.

15.    Milligan recalled that he was first contacted in late 2004 by a person he believes to have been Michael Ayngorn. Ayngorn explained to him that EDG was in the business of buying properties, making improvements and re-selling the properties for a profit, and that EDG would focus primarily on properties in New York, New Jersey and Arizona.

4

16.     Milligan also recalled telling Ayngorn (and subsequent callers from EDG) that he did not have a lot of money and in response to the investor qualification form sent to him by EDG, he specifically told him he did not meet those criteria.

17.     According to Milligan, Ayngorn told him that EDG was going to go public in the near future and would make Milligan rich.

18.     After the initial phone call, on or about December 8, 2004, Milligan received a letter from EDG addressed to "Shareholders," stating, among other things: "Over the last several weeks we have met with and formalized our acquisition team.  This team is made up of Industry Professionals, in Construction, Mortgage Banking, Real Estate and Banking Intuitions. [sic] This preparation will allow us to jump seamlessly from project to project without delay."[4]

19.     Milligan stated that he believed his initial investment with EDG occurred after speaking with Ayngorn, and that he received the PPM after he made this investment.

20.     Milligan stated that he never received audited or unaudited financial statements from EDG.

21.      On or about March 18, 2005, Milligan received another letter from EDG addressed to "Shareholders."[5]  The letter reported, among other things, on EDG's supposed progress thus far. EDG reported, for example, that it had "targeted 16 potential profitable projects, [and] each property can yield profit margins from $65k to as high as $100k per project."  EDG also stated that growth in property values "has prompted us to take immediate steps to start Development projects far ahead of schedule"; and represented, "we are currently awaiting a letter of commitment to become an area distributor for one of the Nations [sic] largest modular

---

[4]     A copy of the letter, dated December 8, 2004, is included in the accompanying appendix as Exhibit 3.

[5]     A copy of the letter, dated March 18, 2005, included in the accompanying appendix as Exhibit 4.

construction developers."

22.    The March 18, 2005 letter also states, "we feel that Development Projects will be much more profitable with conservative expected Return On Investment of 150-300% or better. We feel that our expected Revenue growth should exceed $18-21 Million with in 36 months of commercial operation, while achieving Working Capital in excess of $9-12 Million in that same period."

23.    On about June 28, 2005, Kolb appears to have invested $5,000 in EDGFI.[6]  He told the staff that, prior to investing with EDG, he received a call from a person telling him that EDG was a great company in the business of investing in buildings.

24.    According to Kolb, the caller led him to believe that EDG was actively buying properties.

25.    Kolb recalled telling the caller that he did not have much money to invest.

26.    Kolb also recalled the caller telling him that EDG had already raised $3-4 million, and was going to go public in the near future.  Kolb thought he would make money on his investment by selling his shares to the public when the company went public.

27.    Kolb never received audited or unaudited financial statements from EDG.  Kolb never advised EDG that he was an accredited investor.  He also did not receive a PPM from EDG until sometime after he was already investing with EDG.

28.    Following his initial investment with EDG, Kolb received numerous additional "pushy" calls from EDG, soliciting additional investments.  The callers told him that the company was doing well, that it had bought several properties and that EDG was already making money on some properties.

29.    According to Kolb, subsequent callers also reiterated what he had been told by the first

---

[6]    An "Order Confirmation" received by Kolb from EDG, dated June 28, 2005, included in the accompanying appendix as Exhibit 5.

caller, that an initial public offering for EDG's shares was imminent.

30.    On about August 9, 2005, Milligan received a letter from Michael Ayngorn.[7] The letter, addressed to Milligan personally, provided assurances as to the safety of an investment in EDG. For example, the letter stated:

a.    "**Empire Development Group,** has structured it's [sic] **Fund** to allow Investors the opportunity to receive every penny of their initial Investment back, then continue on to receive income distributions of Net proceeds for the life of the fund. Creating an Investment vehicle that provides long term income potential as well as a focus on initial capital preservation." (Emphasis in original.); and

b.    "Real Estate does not fluctuate significantly short term, we feel we can control the risks involved to a minimum and allow Investors to hedge the rapidly changing and highly speculative tradable markets in both the Securities, Commodities, Bond and Mutual Fund Industries."

31.    Consistent with representations in the August 9, 2005 letter, Milligan recalled an EDG representative telling him that he could always get his money back if he really needed it.

32.    On about August 31, 2005, Milligan appears to have invested $2,500 in EDGFI.[8]

33.    Milligan stated that, throughout the time that he was increasing his investment in EDGFI, he was "hounded" by calls from EDG. According to Milligan, based on what the callers told him, he believed that EDG had already purchased properties and was actively looking to acquire more properties.

---

[7]    A copy of the August 9, 2005 letter is included in the accompanying appendix as Exhibit 6.

[8]    An "Order Confirmation" received by Milligan from EDG, dated August 31, 2005, is included in the accompanying appendix as Exhibit 7.

34.    Milligan recalled that, at least once, the caller even offered to show him the properties, saying that EDG would pay for his airfare.

35.    Milligan also understood, based on representations by the EDG callers, that EDG would be going public in the near future.

36.    On about September 8, 2005, Milligan received another letter from EDG addressed to "Shareholders," which reinforced Milligan's belief about EDG and its future.[9] The letter stated, in part:

   a.    "The company has formulated plans to register the **Empire Development Group (EDG)** Real Estate Fund with the **Securities and Exchange Commission (SEC).** By becoming a publicly reporting company we will allow Investors complete financial transparency with audited financials.  Also, by achieving reporting company status we take the next step forward to potentially becoming a publicly traded company..." (Emphasis in original.); and

   b.    "Also, by achieving reporting company status we take the next step forward to potentially becoming a publicly traded company in the future.  With this in mind, Management plans to allow Investors the opportunity to transfer their Interest Shares into potential Initial Public Offering (IPO) shares when the company has established a future publicly traded market for its shares."

37.    On or about November 2, 2005, Kolb and Milligan both received a document from EDG with the heading "Re: News Release".[10] That document again highlighted EDG's purported efforts to become a public company and EDG's purported revenue expectations.  The document

---

[9]    A copy of the letter, dated September 8, 2005, is included in the accompanying appendix as Exhibit 8.

[10]    A copy of the November 2, 2005 letter and envelope received by Kolb included in the accompanying appendix as Exhibit 9.

states, among other things:

> a.    "**Empire Development Group (EDG)** is very pleased to announce that the company has registered with the **Securities and Exchange Commission (SEC)**, as well as filing with the **New York State Securities Investor Protection & Real Estate Financing Bureau.** These registrations are the first major step to allow EDG to achieve Public Market status for the company's shares." (Emphasis is original.);

> b.    "Following the completion of **EDG's** 5 Million dollar **Fund I** Equity Financing, Management projections for Gross Revenue are expected to exceed 40 Million dollars within the next 5 years of Commercial Operations, as well as, growing Working Capital to over 20 Million dollars in the same time span..." (Emphasis is original); and

> c.    "...Management has formulated plans to allow all Fund I shareholders to qualify their shares to be sold through the potential Public Offering of the company."

38.    Milligan told the staff that he had read the November 2, 2005 news release, and understood it to mean that EDG was taking steps to go public and that an initial public offering was near at hand.

39.    On November 28, 2005, Milligan received from EDG a sheet entitled "Instructions to view SEC Filings" that provides the EDGAR link to EDG's notice to sell shares under Regulation D.[11]

40.    On or about December 5, 2005, Milligan appears to have invested another $22,500 in EDGFI.[12]

---

[11]    The November 28, 2005 document is included in the accompanying appendix as Exhibit 10.

[12]    An "Order Confirmation" received by Milligan from EDG, dated December 5, 2006, and apparently signed by Felix Straton, is included in the accompanying appendix as Exhibit 11.

41.     On about January 6, 2006, EDG sent another letter addressed to "Shareholders," stating, among other things, that EDG "expects 2006 to be a banner year for the company."[13]   The letter further explained that "**Fund I's** much anticipated acquisition phase is currently underway with a series of development projects being finalized as we speak. . . . This project is the first step to our foray into full development construction." (Emphasis in original.)

42.     EDG's January 6, 2006 letter also represented that, "We have partnered with one of the leading builders in the Northeast, to provide full in-house construction opportunities while decreasing the costs of outsourcing and sub-contracting.  With that in mind we are formulating plans for future projects, next of which will be valued at approximately $2.5-$3 million with a potential return on investment of $1.5 million."

43.     In addition, the January 6, 2006 letter again referred to the prospect of EDG going public, stating, "Corporate Counsel has noted that if current projects continue, the prospects of a public offering for the Company is excellent in the future.  As always, all shareholders will have an opportunity to benefit from a future offering of the Company's shares."

44.     On about January 30, 2006, EDG sent another letter to "Shareholders," announcing that EDG had moved its headquarters to a larger space to accommodate "expanding business operations."[14]

45.     On or about May 1, 2006, Milligan appears to have invested an additional $12,500 in EDGFI.[15]

---

[13]     A copy of the January 6, 2006 letter and envelope sent to Kolb are included in the accompanying appendix as Exhibit 12.

[14]     A copy of the January 30, 2006 letter and envelope sent to Kolb are included in the accompanying appendix as Exhibit 13.

[15]     An "Order Confirmation" received by Milligan from EDG, dated May 1, 2006, and apparently signed by Felix Straton, is included in the accompanying appendix as Exhibit 14.

46.     On or about June 1, 2006, Kolb and Milligan received yet another letter from EDG.[16]  In

addition to announcing another round of financing "expected to" raise $50 million, the letter

reported:

> in the past several months' [sic] Management has begun formulating plans, to
> actively pursue several multi-property development projects in the New York  tri-
> state area.  Our current focus is in Bergen County. . . .[The] price ranges allow us
> to achieve profit margins in excess of 400-600 thousand dollars per project.
> Achieving a return on investment dollar of 75-125 percent.

47.     The letter also referred to EDG's "planned nationwide expansion," and specifically stated

that "Management is actively pursuing plans to start development projects in the fast growing

areas of Florida, Nevada and California."

48.     A few days later, on or about June 6, 2006, Milligan agreed to invest an additional

$12,500 in EDGFI.[17]

49.     On or about October 23, 2006, Kolb and Milligan received from EDG the PPM dated

October 23, 2006.

50.     On or about late-October / early November 2006, Kolb appears to have invested $2,500

in EDG[18] and Milligan appears to have invested $10,000 in EDG.[19]

51.     Kolb's son ("Robert") told the staff that, in late 2006, he reviewed his father's

investments with EDG and read the October 23, 2006 PPM.  Robert stated that he called EDG to

---

[16]     A copy of the June 1, 2006 letter and envelope are included in the accompanying
        appendix as Exhibit 15.

[17]     An "Order Confirmation" received by Milligan from EDG, dated June 6, 2006, and
        apparently signed by Michael Ayngorn, is included in the accompanying appendix as
        Exhibit 16.

[18]     An "Order Confirmation" received by Kolb from EDG, dated October 30, 2006, and
        apparently signed by Michael Ayngorn, is included in the accompanying appendix as
        Exhibit 17.

[19]     An "Order Confirmation" received by Milligan from EDG, dated November 6, 2006, and
        apparently signed by Michael Ayngorn, is included in the accompanying appendix as
        Exhibit 18.

complain, in part because he read that EDG would be paying Straton and Ayngorn about

$250,000 per year. Kolb recalled that he was also surprised and upset when his son brought to

his attention the salaries that Straton and Ayngorn were apparently receiving.

52.     Robert told the staff that he spoke directly with Straton, and, among other things, Robert

asked Straton to refund his father's investment. According to Robert, Straton refused to return

Kolb's money. Robert told the staff that Straton also defended his salary and told Robert that

Kolb would be missing out on a big opportunity, if he withdrew his investment, because EDG

was gearing up to buy properties in New York and New Jersey.

53.     On about January 5, 2007, Kolb and Milligan received another letter from EDG,

reporting that "EDG has . . . started the process that will ultimately see our shares registered and

listed with the Securities and Exchange Commission (SEC)." [20]

54.     The letter also represented, among other things:

a.      "Management is extending its reach to other facets of the real estate industry by

expanding into retail and commercial Real Estate Brokerage.";

b.      "We anticipate that within the next 18-24 months that we will be able to open and

operate several satellite Real Estate Brokerage offices in the New York tri-state area";

c.      "[M]anagement is currently formulating plans to pursue a large *Planned Unit*

*Development (PUD)* project, directly following the company's next round of financing.

This project will incorporate a multi-home development with both public and private

areas including park setting and potential commercial and retail establishments"; and

---

[20]     A copy of the January 5, 2007 letter and envelope are included in the accompanying
         appendix as Exhibit 19.

d.    "Management is currently in negotiations with corporate counsel to achieve a

large financial infusion . . . utilizing some of the financial communities biggest names."

55.    Around the time of the January 5, 2007 letter, Milligan also recalled an EDG

representative telling him on the phone that EDG was very close to going public.  Milligan told

the staff that he had the impression from the call that EDG would already be a public company

by now.

56.    I declare under penalty of perjury that the foregoing is true and correct.


Executed on May 15, 2007
New York, New York


Edward Janowsky