Mark K. Schonfeld (MS-2798)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 4300
New York, NY  10281
(212) 336-1020
(212) 336-1322 (fax)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**                    :
                                                           :
                    **Plaintiff,**                         :
                                                           :
         **-against-**                                     :
                                                           :         07 Civ.    (    )
**EMPIRE DEVELOPMENT GROUP, LLC**                          :
**EMPIRE DEVELOPMENT GROUP FUND I, LLC**                   :
**CASTLE HILL VENTURES, LLC,**                             :
**FELIX STRASHNOV a/k/a FELIX STRATON and**                :
**MICHAEL AYNGORN,**                                       :
                                                           :
                    **Defendants.**                        :
                                                           :
------------------------------------------------------------------x

### DECLARATION OF TERRENCE P. BOHAN IN SUPPORT OF PLAINTIFF'S EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, ASSET FREEZE, <u>ORDER TO SHOW CAUSE, AND OTHER RELIEF</u>

1.    I, Terrence P. Bohan, pursuant to 28 U.S.C. 1746, declare as follows:

2.    I am over 18 years of age and am employed as a branch chief in the Broker/Dealer

Inspection Program in the New York Regional Office of the Securities and Exchange

Commission ("Commission").  I have been employed at the Commission for over eleven years.  I

make this Declaration in support of the Commission's Emergency Application for Temporary

Restraining Order, Asset Freeze, Preliminary Injunction, Order to Show Cause, and Other Relief

("Application") involving Felix Strashnov, a/k/a Felix Straton, Michael Ayngorn, Empire

Development Group, LLC ("EDG"), Empire Development Group Fund I, LLC ("EDGFI") and

Castle Hill Ventures, LLC ("Castle Hill").

3.    I make this Declaration based upon personal knowledge, information and belief. The

sources of my information and the bases of my belief are documents obtained and reviewed by

the Commission staff, interviews of Defendants Ayngorn and Straton and EDG/EDGFI investors

conducted by myself and other Commission staff, and information provided to me by other

members of the Commission staff. The statements of others set forth herein are described in

substance and in part, and not verbatim. To the extent that there are assertions herein concerning

dates and numbers, they are approximate, based upon information and evidence gathered to date.

Because the Commission submits this Declaration for the limited purpose of supporting this

Application, I have not set forth each and every fact that I know about the investigation.

4.    During the Commission staff's investigation, which is ongoing, I have (1) visited EDG's

office at 1795 Coney Island Avenue, 3rd Floor, Brooklyn NY 11230 on May 1, 2007; (2)

interviewed Straton and Ayngorn during that visit; (3) conducted telephone interviews with

investors; (4) reviewed documents provided to the staff by investors; and (5) reviewed

information provided to me by other members of the Commission staff, including public records,

asset searches, and other research.[1] Based on this information, I have determined the facts set

forth below.

5.    Emergency relief is needed here because the staff's expedited investigation shows that

EDG and its principals, Straton and Ayngorn, appear to be currently soliciting investors. They

---

[1]    Certain of the documents I reviewed are referenced in this declaration and included in the
Commission's accompanying volume of exhibits, with the exception of Exhibit 29,
attached hereto.

2

have recently solicited investments from at least three investors using false promises of, among

other things, an imminent initial public offering ("IPO").   Straton, Ayngorn, and other EDG

employees also made false statements to those investors about the nature of EDG's business,

assets and operations.  For example, Straton and Ayngorn told investors that EDG was buying,

renovating, and reselling real estate in the Northeast; however the only real estate EDG appears

to have purchased are two homes, one in the name of Straton and one in the name of Ayngorn.

6.      EDG has no shares of securities registered with the Commission, but has purported to be

selling private placement shares.  EDG sold these shares without registering the offering with the

Commission, despite EDG's general solicitation of investors through cold-calling, its sale of

securities to at least two investors who do not possess sufficient assets or income to be accredited

investors, and the absence of any applicable exemption from the securities registration

requirements.

**The Defendants**

7.      **EDG** purports to be a Delaware Limited Liability Company organized on October 15,

2004 as Castle Hill Ventures, LLC.   According to EDG's October 23, 2006 private placement

memorandum, Castle Hill changed its name to EDG on October 4, 2006.[2]  EDG's office is

located at 1795 Coney Island Avenue, Brooklyn, New York, 11230.  EDG is a managing

member of EDGFI.

8.      **EDGFI** purports to be a private real estate investment fund organized as a Delaware

Limited Liability Company.  Castle Hill, and subsequently EDG, is the managing member of

EDGFI.  The staff does not know whether EDGFI continues to have a separate corporate

existence.

---

[2]     A copy of Defendants' November 1, 2004 and October 23, 2006 PPMs are included in
        the accompanying appendix as Exhibits 1 and 2, respectively.

3

9.    **Castle Hill** appears to be the predecessor entity to EDG. However, Straton advised me

that there is still a bank account in Castle Hill's name, and, according to the New York

Department of State, Castle Hill continues to exist as a foreign limited liability company.

10.    **Straton**, age 36, is a managing member of EDG. He is a resident of Brooklyn, New

York and held Series 7 and Series 63 licenses to sell securities. Straton was formerly associated

with Paragon Capital Markets, Inc. and Barrett Day Securities. Straton was sued by the New

York State Attorney General's Office in July 1996 for fraud and misappropriation based on the

offer and sale of stock of a defunct New Jersey corporation. On September 4, 1996, Straton

consented to a judgment enjoining him from engaging in fraudulent practices and prohibiting

him from offering, selling, or promoting any securities within or from New York State until and

unless full restitution was paid to defrauded investors.[3]  On May 1, 2007, I interviewed Straton at

EDG's office.

11.    **Ayngorn**, age 35, is also a managing member of EDG. Ayngorn is a resident of

Brooklyn, New York. Ayngorn does not hold any securities licenses but has worked at four

broker-dealers, J.S. Securities, Inc., Greenway Capital Corp., Toluca Pacific Securities and E.C.

Capital. On May 1, 2007, I interviewed Ayngorn at EDG's office.

**The Staff's Visit to EDG Identifies what Appears to be Ongoing Violations**

12.    On May 1, 2007, the Commission's broker-dealer examination staff conducted a visit to

EDG's office located at 1795 Coney Island Avenue, Brooklyn, NY. I was one of the two

examiners present. At that location, I observed some of the typical indicia of a cold-calling

---

[3]    A copy of a complaint filed by New York Attorney General's Office against Straton,
among others, is included in the accompanying appendix as Exhibit 20. A copy of the
Order to Show Cause and Temporary Restraining Order against Straton issued July 12,
1996 is included in the appendix as Exhibit 27. A copy of Straton's Consent to the Final
Judgment and Order is included in the appendix as Exhibit 28.

4

("boiler room") operation, including (a) Empire business cards (in the names of "directors" Marc Ocean, Leon Shay, and Steve Rice) taped to the phones or near the phones; (b) hundreds of lead cards (with names, addresses, phone numbers, and other information about potential investors); (c) what appeared to be a sales script; (d) numerous small maps containing the U.S. time zones; (e) EDG correspondence to investors; (f) an apparent investor contact list containing hand-written notes, such as "left message" and "not interested"; (g) two versions of EDG-related private placement memoranda; (h) a box of professionally printed color brochures featuring EDG; and (i) large numbers of Express Mail envelopes addressed to individuals and bearing the return address of EDG.

13.     Straton described EDG to me as a real estate development company in the business of buying properties, renovating them, and selling them at a profit. Straton told me that he started the business with Ayngorn in 2004 and that there are no other employees of EDG. He told me that, other than a few minor projects, EDG's main focus has been on raising funds from investors. He further stated that, without investor funds, Empire would not be able to invest in any properties.

14.     I questioned Straton about EDG's efforts to raise money from investors. He told me that Empire began raising money in 2004 through an offering in the name of EDGFI. He estimated that EDGFI had raised between $1.2 and $1.5 million from between 50 and 100 individuals. Straton told me that the majority of those funds were used for general "work money" and for running the business, including paying contractors, architects and salaries. Straton told me that no monies had been returned to investors.

15.     While at EDG, I observed two distinct offering memoranda. Straton told me that the initial offering was for shares of EDGFI, which was now closed, and the current offering is

5

entitled Empire Development Group. Straton estimated that EDG had raised approximately $500,000 in the second offering, and that some of that money had come from the same individuals who had invested in EDGFI.

16.     Straton told me that EDG locates investors through personal relationships, marketing campaigns, and marketing companies. Straton told me that EDG used various marketing companies to locate potential investors interested in real estate. According to Straton, a marketing company would approach potential investors and send EDG materials to those who indicated interest. Investors then contacted EDG to invest. Straton told me that he only accepted investments from accredited investors.

17.     Straton's description of the process by which EDG obtained investors was contradictory and often unclear during my interview. He told me at one point that EDG employed no salespeople and relied on consultants and marketing companies to locate and screen potential investors. He later admitted that individuals who worked on "marketing campaigns" operated out of the EDG office. He refused to identify these individuals and claimed that they were not EDG employees. He also claimed at one point that he and Ayngorn were the only EDG employees who spoke to investors. Straton told me that there was "no selling" by any of the marketing or consulting staff. When asked about Marc Ocean, whose business card was taped to a telephone and whose name appeared as the sender on the Express Mail envelopes I saw, Straton told me that Ocean was a marketing consultant who he had not seen in several months.

18.     Straton told me that EDG had, since its inception, purchased only two properties. However, title to those properties is not in the name of EDG, but rather is held in the names of Straton and Ayngorn. The first property is located at 2 Harris Place, Fair Lawn, New Jersey. Straton told me that the Fair Lawn property was purchased in his name, rather than that of EDG,

6

because EDG had no established credit history and had been unable to obtain a mortgage at a good rate. Straton told me that the purchase price of the Fair Lawn property was approximately $435,000. Straton estimated that renovations would cost between $300,000 and $400,000, but that the property then could be resold for $1.2 million. Straton showed the staff architectural blueprints of the Fair Lawn property. We asked to look at them more closely and saw that they were titled "Strashnov Residence."

19.     Straton further told me that EDG's second property was located in Brooklyn, New York and had been purchased in 2005 in Ayngorn's name. He and Ayngorn told me that they could not recall the address of the property. Straton told me that he was waiting for a Certificate of Occupancy before he could sell the property, but that the property was occupied in the meantime. Straton estimated that the Brooklyn property would sell for somewhere between $1.9 and $2 million and would result in a $300,000 - $400,000 profit for EDG.

20.     Straton told me that, other than those two properties, EDG had no other properties or sources of revenue. Straton told me that EDG had very little money in the bank and that the properties, expenses, and salaries had depleted the funds raised in the offerings. He told me that Castle Hill is essentially the same as EDG and has no employees other than Straton and Ayngorn, but that it does have its own bank account.

21.     I asked Straton about his plans for EDG and the prospects of taking EDG public. He told me that, although it would be his "dream to take the company public," he is nowhere close to realizing that dream. According to Straton, the first step towards going public would be selling the Fair Lawn property and the Brooklyn property. Straton added that EDG has not generated any revenues, and that without the sales of the currently held properties, EDG will remain in the

7

"red." Straton also acknowledged that, in order to go public, EDG would need audited financial statements, which it did not currently have.

22.     I searched the Commission's public records and found no evidence that EDG or EDGFI have filed any registration statements with the Commission, as would be required to conduct an initial public offering.

**Solicitations of Investors**

23.     I have spoken with, and reviewed certain correspondence of, two investors in the EDGFI and EDG offerings.  These interviews indicate that, as opposed to Straton's description of marketing firms locating interested potential investors and those investors then contacting EDG, EDG personnel cold-called prospective investors and used high-pressure sales tactics, rife with misrepresentations, to solicit investments.

24.     I conducted phone interviews on April 23, 2007, along with other members of the Commission staff, with the above two EDG investors, William Kolb and James Milligan.  These interviews are described in greater detail in the Declaration of Edward Janowsky.  My interviews with Kolb and Milligan indicate that, contrary to Straton's representations:

> (a) both investors were initially contacted by EDG by phone, and had no previous connection with EDG or the person who called;
>
> (b) both investors told the callers in words or substance that they were not accredited investors and had little money to invest;
>
> (c) both investors were given the impression that EDG already owned properties and was investing in development projects such as apartment buildings; and
>
> (d) both investors were told that EDG would go public in the near term.

**Private Placement Memoranda**

25.    Both Kolb and Milligan were sent PPMs for EDGFI and EDG <u>after</u> making their initial investments in EDG or EDGFI . Kolb and Milligan provided copies of the PPMs to the staff and I reviewed them. Those PPMs contained representations inconsistent with what Kolb and Milligan had been told over the phone when they were first solicited, and inconsistent with later representations in correspondence from EDG to the investors.

26.    The PPMs purport to offer investors the opportunity to participate in the real estate market by purchasing units in a fund that will be used to "acquire a portfolio of single and multi-family attached residential real estate properties including underdeveloped parcels for development, renovation or rehabilitation . . . and ultimately for resale." PPMs for both EDG and EDGFI claim that the sales of the units are exempt from registration under Section 4(2) of the Securities Act of 1933 and Rule 506 of Regulation D.

27.    The PPMs represent that EDGFI and EDG will use the offering proceeds to (i) conduct real estate market research and project feasibility studies, (ii) acquire  raw land and improved parcels, (iii) pay development expenses, including, without limitation, legal services, architectural services, engineering services, building materials, building contractor services and other labor, and finance-related costs, (iv) pay liability and other insurance premiums, (v) pay unit marketing expenses, and (vi) for general working capital including salaries payable to the chief executives (Straton and Ayngorn). (<u>See</u> Exs. 1 and 2.)

28.    Neither PPM discloses Straton's previous disciplinary history. Straton was sued by the New York State Attorney General's Office and at least temporarily enjoined from offering, selling, or promoting securities within or from the State of New York.

29.    Those PPMs are described in greater detail in the Janowsky Declaration.

9

**Correspondence with Investors**

30.     Kolb and Milligan received correspondence from EDG that I reviewed. Those letters made numerous representations about EDG's business prospects and future plans, including:

  a.  that the company has registered with the Commission as "the first major step to allow EDG to achieve Public Market status for the company's shares";

  b.  that the management projects revenues exceeding $40 million over the next 5 years and growth of working capital to $20 million; and

  c.  that management was actively pursuing multi-property development projects and planned nationwide expansion.

31.     These statements do not appear to be accurate and are inconsistent with statements made to me by Straton on May 1, 2007 and are inconsistent with publicly available information that I have searched, including the Commission's public records.

**Empire's Web Site**

32.     EDG maintains a website at www.empirefund.com. I viewed the website and downloaded a copy of what I had viewed.[4]  The website featured pictures of homes, apartment buildings and construction workers. The website contained the following representations:

  a.  "As one of the Northeast's leading real estate partnership fund developer companies, quality is at the heart of everything we do..."

  b.  "Our focus is on identifying and exploiting...opportunities made possible through bank and/or other mortgage foreclosures and future Development Projects."

  c.  "The geographic market within which we will be pursuing our investing activity is expected to be limited to New York City and Long Island."

---

[4] A copy of certain relevant pages from EDG's website is included in the accompanying appendix as Exhibit 21.

33.     These representations are not consistent with what Straton and Ayngorn told me on May

1, 2007, nor are they consistent with available public records such as property records.

**Information from Public Records**

        **Ayngorn's Brooklyn Residence**

34.     Straton and Ayngorn told me that they could not recall the address of the EDG property

in Brooklyn held in Ayngorn's name.  A search of public records indicates that there is only one

property in Brooklyn that has been purchased since EDG's inception in Ayngorn's name.  That

property, 2359 Royce St., was purchased in the names of Ayngorn and his wife Diana as tenants

in the entirety on July 27, 2005 for $635,000.[5]  At that time, two mortgages were taken against

the property for a total of $600,000.[6]

35.     On September 11, 2006, Ayngorn transferred his interest in the Brooklyn property to his

wife for no apparent consideration.[7]  On the transfer records filed with the City of New York,

Ayngorn and his wife identify the Brooklyn property as their residence and list its address as

their home address.

        **Straton's Fair Lawn Residence**

36.     Straton told me that the Fair Lawn property which had been purchased in his name would

be renovated and sold, thus producing a profit for EDG.  This is not consistent with what Straton

told the Fair Lawn Zoning Board of Adjustment on January 22, 2007, when he testified in

---

[5]     A copy of the deed from the New York City Department of Finance records for 2359
        Royce Street is included in the accompanying appendix as Exhibit 22.

[6]     Copies of documents from the New York City Department of Finance reflecting two
        mortgages for 2359 Royce Street are included in the accompanying appendix as Exhibits
        23 and 24.

[7]     A copy of the transfer documentation from the New York City Department of Finance
        records for 2359 Royce Street is included in the accompanying appendix as Exhibit 25.

11

support of his request for a variance of zoning requirements for his renovation. When asked whether he intended to live in the house, he responded "Yes."[8]

### Documents Filed with New York State

37.    I have reviewed certain documents filed with the New York State Office of the Attorney General Investor Protection / Department of Law at 120 Broadway, New York, New York, by EDG. Those documents include a Form 99 signed by Straton on November 11, 2005. The Form 99 contains an item asking whether any principal or controlling person of the issuer is "subject to or a respondent in any legal action for, any injunction, cease–and-desist order or order or stipulation to desist or refrain from any act or practice relating to the offering of securities in New York or any other jurisdiction?" EDG answered no.[9]

38.    Based on the above, it appears that the Defendants have solicited investments in an unregistered offering through misrepresentations about, among other things, the nature of the investment, uses of the proceeds of the offering, the operations of the business, the existence of assets, and the likelihood of a public offering. Our expedited investigation indicates that the Defendants appear to have misappropriated the proceeds of the offering for their personal use and continue to solicit investors. A temporary restraining order, verified accountings, an asset freeze, and an order permitting expedited discovery are necessary in this case to preserve the status quo and identify any remaining assets for defrauded investors. The staff is concerned that absent emergency relief, the Defendants will continue to misappropriate investor funds and divert assets.

---

[8]    A copy of relevant portions of the transcript reflecting Straton's statements to the Fair Lawn Zoning Board of Adjustment is included in the accompanying appendix as Exhibit 26.

[9]    A copy of the Form 99 is attached hereto as Exhibit 29.

39.     Pursuant to 28 U.S.C. §1746, I, Terrence P. Bohan, declare under penalty of perjury that

the foregoing is true and correct.


Executed on May *16* 2007
New York, New York


_____
Terrence P. Bohan

# EXHIBIT 29

**M.M. MEMBRADO, PLLC**

115 EAST 57TH STREET, SUITE 1006 • NEW YORK, NEW YORK 10022

TELEPHONE: 646.486.9770 • TELEFAX: 646.

N05-9746

VANESSA J. SCHOENTHALER
E-MAIL: vjs@mmmembrado.com

DIRECT DIAL: 646.486.9774
www.mmmembrado.com

**Via Federal Express**

November 21, 2005

**Office of the Attorney General**
**Investor Protection**
**Department of Law**
120 Broadway, 23rd Floor
New York, New York 10271

Re:    Empire Development Group Fund I, LLC

Dear Sir or Madam:

Enclosed herewith, for the above-referenced issuer, please find the following (i) a duplicate Form D; (ii) an original, manually signed, Form U-2; (iii) one original, manually signed, and one duplicate Form 99; and (iv) a copy of the above-referenced issuer's offering document. Please also find two checks in the amount of $1,950 and $35 for filing fees associated with the Form 99 and Form U-2, respectively, as well as an additional copy of the Form D cover page. Please acknowledge the receipt of this filing by returning, date stamped, the additional cover page. I have included a self-addressed envelope for your convenience.

Should you have any questions or require any additional information, please do not hesitate to contact me at (646) 486-9774.

Thank you.

Best regards,

M.M. MEMBRADO, PLLC

Vanessa J. Schoenthaler

VJS/fes
Encl.
cc.:    Office of the Attorney General,
        Department of State

**FORM 99**

File # _____

## STATE OF NEW YORK DEPARTMENT OF LAW
## BUREAU OF INVESTOR PROTECTION AND SECURITIES // REAL ESTATE
## FINANCING BUREAU
## NOTIFICATION FILING

**Pursuant to National Securities Markets Improvement Act of 1996 ("NSMIA")**

**Submission to:**

[  ] INVESTOR PROTECTION AND SECURITIES BUREAU ("IPS")

        [  ] Securities
        [  ] Theatrical Syndications

[X] REAL ESTATE FINANCING BUREAU ("REF")

**Type of Filing:**

        [X] New Filing
        [  ] Amendment or Renewal (If name, address or offering has changed,
        indicate change):

## A. BASIC IDENTIFICATION DATA

**Full Name of Issuer (and Theatrical Production company, if applicable):**

*Empire Development Group Fund I, LLC*

**Address of Executive Offices:**          **Telephone Number:** *(718) 252-3220*

| *1991 Flatbush Avenue* | *Brooklyn* | *NY 11234* |
|---|---|---|
| (Number and Street) | (City or Town) | (State & ZIP) |

**Type of Organization:**

[  ] business corporation    [X] limited liability company    [  ] limited partnership

[  ] not-for-profit corporation    [  ] business trust    [  ] political subdivision of state

[  ] common fund    [  ] state agency or authority    [  ] other (specify):

[  ] county, city, town or village    ([  ] agency, authority or instrumentality corporation)

**Category of "Covered Security" (NSMIA):**

>   [  ] Offering to "Qualified Purchasers" [1933 Act* §18(b)(3)]
>   [X] Rule 506 Offering [1933 Act* § 4(2) - per §18(b)(4)(D)]
>   [  ] Other qualifying offering (specify):
>   * Securities Act of 1933, as amended

**The Securities Will Be Sold By:**

>   [X] officers or directors of issuer        [  ] salespersons employed by issuer
>   [  ] officers or directors of an           [  ] underwriter, dealer or broker registered
>   affiliated person                          in New York

**For Theatrical Syndication Offerings, add the following information:**

>   Name of proposed production:
>   Location of production:
>   Proposed opening date:

## B. INFORMATION ABOUT OFFERING

**Total Offering Amount:**

>   **Maximum: $ 5,000,000**
>   **Minimum: $ 0**

**Type of Security Offered (brief description):**

>   *Series A Preferred Limited Liability Membership Interests*

**Enclosures (add additional sheets if necessary):**

>   [X] Copy of Consent to Service of Process (original to Department of State, Albany NY)
>   [X] Offering Documents
>   [X] Confidential Attachment to Form 99
>   [  ] Further information as to [  ] issuer [  ] affiliated persons
>   [X] Form D, with Part D (State portion), plus: [X] copy "as filed" with the S.E.C. " [  ]as filed" copy will follow
>   [  ] Theatrical Venture Amendment - Required Supplemental Information

## C. INFORMATION ABOUT ISSUER, PRINCIPALS AND CONTROLLING PERSONS

**As to issuer:**

| | |
|---|---|
| 1. Is issuer subject to, or a respondent in any legal action for, any injunction, cease-and-desist order or order or stipulation to desist or refrain from any act or practice relating to the offering of securities in New York or any other jurisdiction? | [  ] Yes  [ ✓ ] No |
| 2. (a) Has issuer ever been convicted of or pleaded guilty to any crime (i) involving any fraud, or (ii) relating to any financial transaction or handling of funds of another person, or (iii) pertaining to any dealings in any securities? | [  ] Yes  [ ✓ ] No |
| 2. (b) Is issuer now a defendant in any such criminal proceeding ? | [  ] Yes  [ ✓ ] No |

**As to each Principal\*, each Controlling Person, and any Sponsoring Entity of issuer:**

| | |
|---|---|
| 3. Is any one of the above subject to or a respondent in any legal action for, any injunction, cease-and-desist order or order or stipulation to desist or refrain from any act or practice relating to the offering of securities in New York or any other jurisdiction? | [  ] Yes  [ ✓ ] No |
| 4. (a) Has any one of the above ever been convicted of or pleaded guilty to any crime (i) involving any fraud, or (ii) relating to any financial transaction or handling of funds of another person, or (iii) pertaining to any dealings in any securities? | [  ] Yes  [ ✓ ] No |
| 4. (b) Is any one of the above now a defendant in any such criminal proceeding ? | [  ] Yes  [ ✓ ] No |
| 5. Has any of the above ever been suspended or expelled from membership in any securities or commodities exchange or association or had a securities or commodities license or registration denied, suspended or revoked? | [  ] Yes  [ ✓ ] No |
| 6. Has any of the above been a controlling person or sponsor with respect to any issuer which engaged in a distribution of securities or any public offering within the past three (3) years? | [  ] Yes  [ ✓ ] No |

If the answer to any of the above is "yes", give material facts on an attached sheet.
\* Capitalized terms are defined in Section E of Form 99.

## D. CERTIFICATION

The undersigned affirms and certifies, to his or her knowledge and belief after due investigation and inquiry, and under penalty of perjury, that any and all information provided in this Form 99 is true and complete, and that there are no misrepresentations, omissions or untruths contained herein. The undersigned further understands and intends that the information supplied in this Form will be relied upon by the New York State Department of Law and that any false statement made herein is punishable as a Class A misdemeanor under New York Penal Law §175.30, §210.45, or both.

Dated: _____ , 2005

Issuer (name of entity): *Empire Development Group Fund I, LLC*

By: _____

Authorized Principal or Controlling Person

_____

Print Name & Title or Affiliation