Counsel of Record:
Mark K. Schonfeld (MS-2798)
Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Room 4300
New York, NY  10281
(212) 336-1020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**          :
                                                 :
             **Plaintiff,**                       :
                                                 :
       **-against-**                              :
                                                 :          **07 Civ. 3896 (PKC)**
**EMPIRE DEVELOPMENT GROUP, LLC.,**               :
**EMPIRE DEVELOPMENT GROUP FUND I, LLC,**         :
**CASTLE HILL VENTURES, LLC,**                    :
**FELIX STRASHNOV a/k/a FELIX STRATON and**       :
**MICHAEL AYNGORN,**                              :
                                                 :
             **Defendants.**                      :
                                                 :

----------------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff Securities and Exchange Commission (the "Commission") submits this memorandum of law in support of its motion for summary judgment against Empire Development Group, LLC ("EDG," or the "Company"), Empire Development Group Fund I, LLC ("EDGFI"), Castle Hill Ventures, LLC ("Castle Hill"), Felix Strashnov ("Straton") and Michael Ayngorn (collectively, "Defendants").

## I.    PRELIMINARY STATEMENT

On May 18, 2007 the Commission moved this Court for injunctive relief to enjoin Defendants' ongoing violations of federal securities laws, namely those provisions of the Securities Act of 1933, 15 U.S.C. § 77, and the Securities Exchange Act of 1934, 15 U.S.C. § 78, that forbid the sale of unregistered securities (except in certain limited circumstances not present here), and prohibit fraud in connection with the sale and marketing of securities. Pursuant to this Court's May 18 order to show cause, the Commission deposed EDG's two principals, Defendants Straton and Ayngorn (the "Individual Defendants"), and reviewed numerous bank, property and other records produced by Defendants. The Commission also deposed an EDG salesperson, Al Nazon, who confirmed that he and others marketed and sold unregistered EDG securities using false and misleading statements to solicit millions of investment dollars.

On June 12, 2007 this Court issued a preliminary order enjoining Defendants from violating the securities laws and freezing certain of EDG's remaining assets. Soon after the June 12 Order, Defendants served their respective responses to the Commission's complaint and represented that their production of discovery responsive to the Commission's requests is substantially complete. The Commission respectfully submits that this record presents no genuine issue of material fact concerning any element of the Commission's claims against Defendants. In fact, the record unequivocally establishes, inter alia, the following:

- Defendants sold unregistered securities to the investing public, including numerous unaccredited investors, without providing investors with the audited financial statements or other information required by Section 5 of the Securities Act.

- Defendants misrepresented and omitted material facts in connection with their marketing and sale of EDGFI and EDG securities (collectively, "Empire Securities"). Defendants' misrepresentations include: false claims that the Company was taking significant steps toward becoming a public company, registering Empire Securities with the Commission and planning an IPO; false reports of "institutional investors'" interest in EDG; and false representations that numerous investment projects were "being finalized" when, in fact, EDG was never even close to undertaking such endeavors.

- Despite raising approximately $2.9 million from unsuspecting investors, EDG failed to disclose it was in such poor financial shape that the only two properties Defendants ever purchased – one in Brooklyn, New York and another in Fairlawn, New Jersey – were mortgaged immediately for almost their full value. Moreover, without any legitimate business justification, Defendants placed the properties in Straton's and Ayngorn's names, not the Company's name. Defendants never disclosed to investors the existence of any mortgages on the properties or the fact that neither property was purchased in the Company's name. Likewise, Defendants did not tell investors that Ayngorn used the Brooklyn property as his personal residence (rent free) or that Straton intended to do the same with the New Jersey property.

- The Individual Defendants improperly collected more than $1 million in "salaries" after promising investors that they would defer the lion's share of their compensation until the Company was on solid financial footing. Defendants admitted that these exorbitant

2

withdrawals were inconsistent with the business plan articulated to investors, and further testified that Ayngorn withdrew more funds than he was permitted to take as salary to cover personal expenses unrelated to any EDG business. Nevertheless, Defendants never disclosed their improper withdrawals to investors and continued to solicit investments by boasting of a business plan Defendants knew they had no reasonable chance of executing.

Against a record replete with evidence of Defendants' improper sale of unregistered securities and concomitant fraudulent misrepresentations, Defendants can offer no credible facts that could lead a trier of fact reasonably to conclude that Defendants complied with applicable federal securities laws. Indeed, Defendants implicitly admitted Section 5 liability when they confessed, under oath, to failing to register Empire Securities or take any steps to qualify for an exemption from registration. As for Defendants' fraud, the evidence demonstrates that Defendants knowingly lied to the investing public to keep money flowing into EDG and, ultimately, into Ayngorn's and Straton's pockets. Accordingly, the Commission respectfully submits that this motion for summary judgment should be granted in full.

## II.    STATEMENT OF FACTS

### A.    Background

On October 15, 2004, Ayngorn and Straton created Castle Hill Ventures, LLC, a Delaware limited liability company owned 50% each by the Individual Defendants. (SoF ¶1; Straton at 44-45)[1] According to Straton, Castle Hill was the general partner of EDGFI, which was created to pursue certain real estate ventures to be funded by the investing public. (Straton at 60) On or around October 4, 2006, Castle Hill became EDG (SoF ¶2), which continued to

---

[1] "SoF ¶__" shall refer to paragraphs in the Commission's accompanying statement of undisputed facts, submitted pursuant to Local Rule 56.1. "Straton at _," "Ayngorn at _" and "Nazon at _" shall refer to the transcripts of Straton's, Ayngorn's and Nazon's testimony, taken on May 29, 2007, May 30, 2007 and July 16, 2007, respectively.

3

function as a general partner for EDGFI and began to offer shares of EDG itself.  (Straton at 61)
As of the commencement of this action, EDG's office was located at 1795 Coney Island Avenue,
Brooklyn, New York, 11230.  (SoF ¶3)

      This action is not the first time Straton has been prosecuted for securities fraud.  In July
1996, the New York State Attorney General's Office brought an action against Straton for fraud
and misappropriation based on the offer and sale of stock of a defunct New Jersey corporation.
(SoF ¶4)  On September 4, 1996, Straton consented to a judgment enjoining him from engaging
in fraudulent practices and prohibiting him from offering, selling, or promoting any securities
within or from New York State until and unless full restitution was paid to defrauded investors.
(Id.)  EDG never disclosed Straton's legal troubles to its investors.  (Id.)

## B.    Defendants' Securities Offerings

      From approximately 2004 through at least the inception of this lawsuit, Defendants
offered and sold securities that purportedly represent membership interests in EDG and EDGFI.
Defendants sold Empire Securities through two unregistered offerings (the "Offerings").  The
first Offering, through which Defendants hoped to raise $5 million, was described in a November
1, 2004 private placement memorandum (the "2004 PPM").  (SoF ¶5)  The second Offering was
described in an October 23, 2006 private placement memorandum (the "2006 PPM") and
purported to offer $25 million worth of EDG securities.  (Id.)  In total, Defendants admit to
raising approximately $2.9 million from investors in the Offerings.  (SoF ¶7)

## C.    Defendants' Section 5 Violations

      Defendants never registered any Empire Securities with the Commission or any other
regulatory body.  (SoF ¶8)  In fact, Defendants admit that "EDGFI commenced an unregistered
offering of securities to its investors."  (Id.)  Furthermore, EDG never provided any audited

financial statements or other audited financial information to investors before – or, for that

matter, after – Defendants sold them Empire Securities. (Straton at 268-69)  Simply put, in

Straton's words, Defendants "weren't financially transparent." (Id. at 206)

     EDG identified potential investors for the Offerings from a list of individuals purchased

from a marketing company named "Code Busters." (Straton at 65)  Potential investors were

ordinarily "cold called" by Ayngorn or one of the numerous salespeople hired to pitch Empire

Securities. (Id. at 78-79)  EDG's salespeople, none of whom appear to hold current licenses or

be registered as, or associated with, a registered broker-dealer, were paid commissions based on

the amount of capital they raised for the Company. (Straton at 91; Nazon at 23, 110-12)

     Defendants utilized interstate mail and telephone calls to market Empire Securities to

accredited and unaccredited investors alike. (SoF ¶11; Straton at 75)  Straton testified that the

only way Defendants would know whether an investor was accredited was through

questionnaires investors were asked to complete. (Straton at 66-68)  But the record indicates

EDG accepted some investors' money before the Company ever received their completed

questionnaires (SoF ¶10), and further reveals that EDG accepted money from investors whose

questionnaires demonstrated that they were not accredited. (Id.)

**D.**    **Defendants' Misrepresentations and Omissions of Material Facts**

     In advance of both Offerings, Defendants presented to investors what purported to be the

Company's business plan. Specifically, in its 2004 and 2006 PPMs, the Company announced

Defendants' purported plan to use offering proceeds for (i) real estate market research and

project feasibility studies, (ii) the acquisition of raw land and improved parcels, (iii) development

expenses, including without limitation legal services, architectural services, engineering services,

building materials, building contractor services and other labor, and finance-related costs, (iv)

liability and other insurance premiums, (v) unit marketing expenses, and (vi) general working capital, including salaries payable to the Straton and Ayngorn. (SoF ¶12)

1.    Defendants Misrepresented Ayngorn's and Straton's Salaries.

On December 8, 2004, Defendants wrote a letter to investors stating that Ayngorn and Straton had "elected to defer salary compensation by 70% until the company has established enough revenue growth to allow management to draw salaries without affecting the overall business plan of the company." (SoF ¶13) In light of Defendants' prior representation, in their 2004 PPM, that Straton's and Ayngorn's annual salaries would not exceed $240,000 (id.), Defendants' December 2004 letter ostensibly signaled that until EDG surpassed certain revenue benchmarks, the Individual Defendants would defer all but a maximum of $72,000 per year.

Defendants admit that the Company never generated any revenue (Straton at 157), yet Ayngorn and Straton paid themselves more than **$1 million** of investors' money. (SoF ¶14) As a threshold matter, Straton and Ayngorn did not fulfill even their most basic responsibilities to the Company and its investors, thus neither individual truly "earned" any salary. But even if Defendants had run EDG as a legitimate business, drawing combined salaries in excess of $1 million is unquestionably contrary to the express representations Defendants published in their December 2004 letter to investors. Indeed, Ayngorn confessed his withdrawals of EDG funds were "above and beyond the salary [he was] supposed to earn." (Ayngorn at 71)[2]

Defendants also admit that their excessive withdrawals were incompatible with the business plan articulated to investors. (See Straton at 155) Nevertheless, Defendants continued to solicit funds without ever disclosing their exorbitant withdrawals to investors. (Straton at 134)

---

[2] According to Defendants, much of the money purloined from EDG was taken to accommodate Ayngorn's purported alcohol and gambling addictions. (Ayngorn at 71; Straton at 52) Defendants claim Ayngorn's problems were so acute that Straton tried to block Ayngorn's access to Company funds, only to have Ayngorn secretly restore his access in order to withdraw additional funds for personal expenses. (Ayngorn at 70-72)

In fact, Defendants maintain Ayngorn's personal financial problems – which purportedly left

EDG "in the red" (Straton at 155) – began well before the Company commenced its 2006

Offering (Ayngorn at 111), but nowhere in EDG's 56 page 2006 PPM is there any mention of the

challenges Ayngorn's problems may have presented for the Company.  (SoF ¶15)

> 2.    Defendants Misrepresented Facts Concerning the Purported Registration of
> Empire Securities and Progress Toward Becoming a Public Company.

EDG repeatedly published false statements regarding the purported registration of Empire

Securities and about steps Defendants claimed to be taking toward becoming a public company.

For example, Defendants stated in a September 8, 2005 letter to investors:

> The company has formulated plans to register the Empire
> Development Group (EDG) Real Estate Fund with the Securities
> and Exchange Commission (SEC).  By becoming a publicly
> reporting company (sic) we will allow Investors complete financial
> transparency with audited financials.  Also, by achieving reporting
> company status we take the next step forward to potentially
> becoming a publicly traded company in the future.  With this in
> mind, Management plans to allow Investors the opportunity to
> transfer their Interest shares into potential Initial Public Offering
> (IPO) shares when the company has established a future publicly
> traded market for its shares.

(SoF ¶14)

Defendants published similar statements in a November 2, 2005 letter to investors:

> EDG is very pleased to announce that the company has registered
> with the [SEC] as well as filing with the New York State Securities
> Investor Protection & Real Estate Financing Bureau. ...  These
> registrations are the first major step to allow EDG to achieve
> Public Market status for the company's shares.

(SoF ¶15)

Then again, in January 2007, Defendants wrote:

> EDG has also started the process that will ultimately see our
> company shares registered and listed with the Securities &
> Exchange Commission (SEC).  We anticipate that following the

company's latest offering, we will be able to achieve public market
status thru (sic) an Initial Public Offering (IPO).

(SoF ¶16)

But the record unequivocally demonstrates that EDG never registered any securities with

the Commission. (SoF ¶8) And Ayngorn's sworn testimony belies entirely the Company's

statements about plans and progress toward becoming a public company:

> **_Q.   Did Empire Development Group have any plans to become a
> public company?_**
>
> A.   Did we have plans?  You know, it was always a – you know,
> if it could happen, it would be a wonderful situation.  But did we
> have plans at the moment to be a public company; were we going
> to be a public company?  *No, we didn't have -- I don't think we
> had plans* ... .
>
> Q.   Was there ever a time when you had the expectation that
> Empire Development Group would become a public company?
>
> A.   Did I ever have expectation?  It was – it was – I've always – it
> would be nice.  But did I have expectation?  I mean – I mean
> "expectation"?  That's -- did I expect it?  No, I didn't expect it ... .
>
> Q.   Did Mr. Straton ever tell you that he was working on any
> plans to take the company public?
>
> A.   I don't believe so.

(Ayngorn 146-47) (emphasis added).[3]  In other words, the Company repeatedly wrote investors

to (i) boast of the upcoming registration of shares that never were registered and (ii) speak of an

initial public offering that Defendants never expected to occur.

   3.   Defendants Misrepresented the Company's Business Ventures.

EDG's actual "business" did not resemble the venture Defendants presented to investors.

For example, Defendants stated in a March 18, 2005 letter to investors that EDG had "targeted

---

[3] Straton was similarly unable to offer any reasonable basis for the Company's repeated representations concerning
IPO plans and registration status.  (See Straton at 265-69)

16 potential profitable projects" and that "expected Revenue growth should exceed $18-21 Million with in (sic) 36 months of commercial operations, while achieving Working Capital in excess of $9-12 Million in that same time period." (SoF ¶17)  The record lacks any evidence supporting these claims.  Straton could not remember the addresses of any specific property – let alone 16 – purportedly targeted in March 2005, and he admits no records exist that identify any property EDG claimed to be targeting at that time. (Straton at 167-68)  Straton also testified that EDG never went to contract, or even placed a bid, on any property in or around March 2005. (Id. at 168)  Moreover, Straton conceded that EDG's strategy for identifying potential projects – described by Straton as seeking properties through public auctions – was not even viable for a company with as little available money as EDG had in March 2005.  In his words: "It's almost impossible to get anything from an auction . . . with the limited funds that we had."  (Id. at 164)

Those "limited funds" rendered the lofty revenue and working capital forecasts set forth in EDG's March 2005 letter impossible to achieve.  Straton admitted EDG could not possibly reach those numbers without millions of dollars in additional funding (Straton at 163) – a highly material fact conveniently omitted from EDG's March 2005 letter.  Straton testified that EDG's letter assumed the Company was fully funded – i.e., that EDGFI's $5 million Offering was fully subscribed. (Straton at 163-64)  But in March 2005, Defendants had not even sold half of the securities made available through the EDGFI Offering.  (SoF ¶20)

As EDG ran short on funds, Defendants' misrepresentations to investors continued.  In a January 6, 2006 letter to shareholders, EDG stated that the Company's "acquisition phase is *currently underway with a series of development projects being finalized as we speak*."  (SoF ¶21) (emphasis added)  But the record reveals that there was no series of projects being finalized in January 2006.  Since EDG's inception, the only properties purchased with investors' money

9

were personal residences for Ayngorn and Straton in Brooklyn, New York (the "Brooklyn Property") and Fairlawn, New Jersey (the "Fairlawn Property"), respectively. (Straton at 157) In fact, the only other project Straton claimed EDG was considering in or around January 2006 was a property in Howell, New Jersey, but that project required approximately $4 million – hardly something that could have been finalized "as we speak" by a company with virtually no money. (Id. at 221-22) Straton admitted as much, testifying that "no matter how we tried to work the numbers, [Howell] just wasn't feasible for us." (Id. at 222)

The January 6, 2006 letter also stated that "[w]e have partnered with one of the leading builders in the Northeast." (SoF ¶22) What the letter did not state was that the "leading builder" was Ayngorn's father, or that EDG paid Ayngorn's father's companies more than $200,000 dollars of investors' money (id.), apparently without ever entering into any agreement with him or disclosing this relationship to investors. (Straton at 226-27)

On June 1, 2006, EDG wrote shareholders to urge additional investment in the Company. EDG stated: "Management is actively pursuing plans to start developing projects in fast growing areas of Florida, Nevada and California." (SoF ¶23) But as Straton conceded, EDG was not actively pursing any projects in Florida, Nevada or California as such plans required "additional financing" the Company did not have available in June 2006. (Straton at 246-48)

EDG also announced in June 2006 that "Management is expecting the majority of the share allocations [in a $50 million offering to go] primarily to institutional investments." (SoF ¶24) Similarly, Defendants wrote to investors on January 5, 2007 to boast that "Management is currently in negotiations with corporate counsel to achieve a large financial infusion thru [sic] *Pipeline Financing*, utilizing some of the financial communities [sic] biggest names." (SoF ¶25) But management had no "institutional" or "pipeline" financing lined up for any, let alone a

10

majority, of a $50 million offering. Defendants never spoke to any institutional investors and were relying entirely on EDG's attorney, who "said he had access to contacts that do pipeline financing." (Straton at 245) Defendants never even discussed with this attorney how much financing might be available "because [they] still thought it was slightly premature." (Id. at 246)

Finally, Defendants' handling of the only two properties ever purchased with investors' money is particularly problematic. Defendants did not purchase the Brooklyn or Fairlawn Properties in the Company's name, opting instead – inexplicably – to put Straton's name on one deed (id. at 113-14) and Ayngorn's wife's name on the other. (Ayngorn at 98) And despite collecting nearly $3 million from investors, EDG purportedly had enough funds to pay only a small fraction of the purchase prices, leaving the EDG to service mortgages amounting to approximately 90% of the Properties' combined purchase price. (Id.; Straton at 114) Furthermore, contrary to representations in EDG's PPMs, Straton told the Fairlawn Town Board he intended to use the Fairlawn Property as his personal residence and commissioned blueprints that identified the property as the "Strashnov Residence." (SoF ¶26) Ayngorn apparently had similar plans for the Brooklyn Property, which he admitted to using rent free as his personal family residence at least through the commencement of this action. (Ayngorn at 6-7)

## III.    ARGUMENT

### A.    Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered forthwith if the pleadings and collected discovery, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec.

11

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To be a "genuine" issue of fact, the evidence must be such that a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Commission has met its burden on all elements of its claims against each Defendant.

**B.    The Defendants Have Violated Federal Securities Laws by Defrauding Investors in Connection with Sales of Unregistered Securities**

1.    Defendants have violated Sections 5(a) and 5(c) of the Securities Act by Offering and Selling Securities in Unregistered Transactions

"Section 5 [of the Securities Act] requires that securities be registered with the SEC before any person may sell or offer to sell such securities." SEC v. Cavanagh, 445 F.3d 105, 111 n.13 (2d Cir. 2006).[4] "To state a cause of action under Section 5, one must show (1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." Id. (internal quotation marks and citation omitted).

On the record established in this case, no jury could reasonably conclude that Defendants complied with Section 5. The instruments offered by Defendants unquestionably constitute "securities" as contemplated by the Securities Act. Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment."

---

[4] The text of Section 5 states, in relevant part:
(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly –
    1.  to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
    2.  to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.
          *        *        *
(c) **Necessity of filing registration statement.** It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security . . . . 15 U.S.C. § 77e (emphasis in original).

Reves v. Ernst & Young, 494 U.S. 56, 65-66 (1990). A security under both Section 2(a)(1) and 3(a)(10) is defined as, inter alia, "any note, . . . evidence of indebtedness, . . . [or] investment contract." Here, Defendants explicitly identified the purported interests in EDGFI and EDG they marketed and sold to investors as "securities" in their 2004 and 2006 PPMs. (SoF ¶6)

The record also unequivocally reflects Defendants' failure to file any registration statement in connection with EDG's Offerings. The Commission has no record of any such filing, and Defendants have not produced any evidence to the contrary in response to the Commission's discovery requests.[5]

Finally, the record reflects Defendants' solicitation of investments from individuals across the United States (SoF ¶11) to whom Defendants would routinely send information about EDG and the securities Defendants were marketing. (See Ayngorn at 53). Thus, the record easily satisfies each element of a Section 5 claim, leaving only the question of whether Defendants are for any reason exempt from Section 5's clear mandate.

### 2.    Defendants are Not Exempt from Sections 5(a) and 5(c).

"Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption." Cavanagh, 445 F.3d at 11 n.13 (citation omitted). No such exemption applies for Defendants here. See 15 U.S.C. § 77d (listing circumstances, inapposite here, under which a party may be exempt from Section 5).

Defendants declare in both the 2004 and 2006 PPMs that their sales are exempt from registration under Section 4(2) of the Securities Act and Rule 506 of Regulation D. (SoF ¶9) The record contains no support for these claimed exemptions. First, to "qualify for exemption

---

[5] Straton defended his failure to comply with applicable registration requirements as a misunderstanding by him of what constitutes a proper "registration statement." (See Straton at 83) But "scienter is not an element of a Section 5 violation." SEC v. UN Dollars Corp., No. 01 Civ. 9059 (AGS), 2003 WL 192181, at *2. Thus, even if Straton's explanation is credited, any purported lack of intent would not excuse Defendants' failure to comply with Section 5.

under [Rule 506], offers and sales must satisfy all the terms and conditions of §§ 230.501 and

230.502." SEC Reg. §230.506(b)(1). Among other requirements, SEC Reg. §230.502 requires

parties seeking an exemption from the registration requirements of Section 4(2) to provide

unaccredited investors with specific information, including financial statements.[6] Defendants

concede that Empire Securities were sold to unaccredited investors. (Straton at 75) But there is

no evidence in the record that suggests Defendants provided unaccredited investors with

requisite financial information. Moreover, the Section 4(2) is inapplicable on its face as it only

pertains to "transactions by an issuer not involving any public offering." 15 U.S.C. §77d(2)

"In determining whether a transaction involves a public offering, the critical question is

'whether the persons to whom the offering is made are in such a position with respect to the

issuer that they either actually have such information as a registration would have disclosed, or

have access to such information.'" Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 03 Civ. 10165

(RJH), 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) (citation omitted). "[T]he applicability of

[the exemption] should turn on whether the particular class of persons affected need[s] the

protection of the Act." SEC v. Ralston Purina Co., 346 U.S. 119, 127 (1953). Here, the

investors Defendants targeted are precisely the kind of investors who need the Security Act's

protection. Many of the investors were elderly, unsophisticated and sometimes unaccredited and

had limited information from which to make decisions concerning Empire Securities. (SoF ¶10)

---

[6] Rule 501 of Regulation D defines the term accredited investor to include, in relevant part:
1. a director, executive officer, or general partner of the company selling the securities;
2. a natural person who has individual net worth, or joint net worth with the person's spouse, that exceeds $1 million at the time of the purchase; or
3. a natural person with income exceeding $200,000 in each of the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year.

Furthermore, Defendants admit that the targeted investors did not have any special relationship with the Company that might provide special access to information a registration would have disclosed. To the contrary, investors were identified by an outside marketing company and cold-called by Defendants and their salespeople. (Straton at 65; Ayngorn at 40-41).[7]

Since Defendants cannot demonstrate any exemption to Section 5's clear registration requirements, summary judgment is warranted on the Commission's Section 5 claims.

### 3. Defendants' Material Misstatements Constitute Violations of the Anti-Fraud Provisions of the Securities Act and the Exchange Act.

Defendants' sales of Empire Securities are actionable under the anti-fraud provisions of both the Securities Act and the Exchange Act. Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of securities. United States v. Naftalin, 441 U.S. 768, 772, 778 (1979). To establish a violation of Section 10(b) and Rule 10b-5, the Commission must show (i) a misrepresentation or omission regarding material facts or other fraudulent conduct, (ii) made with scienter, (iii) in the offer or sale, or in connection with the purchase or sale, of a security. Basic, Inc. v. Levinson, 485 U.S. 224, 235 n.13 (1988) (citation omitted). "[E]ssentially the same elements are required under Section 17(a)(1)." SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) (citation omitted).

A statement or omission is material if a reasonable investor would view its disclosure as significantly altering the 'total mix' of information available. TSC Industries v. Northway, Inc.,

---

[7] Defendants' use of a general solicitation not only renders the exemptions offered by Rule 506 and Section 4(2) unavailable – it precludes the application of any exemption under Regulation D. Rules 504 and 505 of Regulation D expressly require that any issuer seeking the Rules' protection comply with certain requirements set forth in Rules 501 and 502. As explained above, the record here clearly reflects Defendants' failure to satisfy these requirements.

Additionally, Rule 504 is inapplicable because Defendants sought to raise $5 million and $25 million, respectively, in their two Offerings. Rule 504 is limited to offerings that do not exceed $1 million. Similarly, Rule 505 cannot save EDG's second offering because, in addition to the reasons explained above, the exemption under Rule 505 is limited to offerings that do not exceed $5 million.

426 U.S. 438, 449 (1976). The requirement under Section 10(b) and Rule 10b-5 that a fraud be perpetrated "in connection with" the sale of securities is satisfied when the fraud touches the sale of securities. <u>Superintendent of Ins. v. Bankers Life & Cas. Co.</u>, 404 U.S. 6, 12-13 (1971).

Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 also require proof of scienter, or "a mental state embracing intent to deceive, manipulate, or defraud." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 (1976).[8] Proof of scienter can be inferred from circumstantial evidence. <u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375, 390-91 n.30 (1983).[9] Scienter "may be established through a showing of a reckless disregard for the truth." <u>SEC v. McNulty</u>, 137 F.3d 732, 741 (2d Cir. 1998) (citation omitted). In this case, the record is clear that Defendants not only showed a reckless disregard for the truth, but published facts they knew to be false when made.

Defendants' most egregious misrepresentations include statements that:

- EDG had registered securities with the Commission and an IPO was imminent;

- EDG was in negotiations to obtain many millions of dollars of financing from institutional investors;

- EDG was actively engaged in "a series of development projects being finalized" at the very time Defendants were soliciting additional funds from investors; and

- EDG was "actively pursuing" investment properties in Florida, Nevada and California.

These false statements all impart unquestionably material information – indeed, the very reason Defendants published them was, no doubt, to attract investors' interest in Empire Securities.

---

[8] A showing of negligence is sufficient to establish a violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act. <u>See</u> <u>Aaron v. SEC</u>, 446 U.S. 680, 696-97, 701-02 (1980).

[9] For purposes of establishing scienter for corporate defendants, the state of mind of their agents is imputed to them. <u>See</u> <u>SEC v. Interlink Data Network of Los Angeles, Inc. et al.</u>, 1993 U.S. Dist. LEXIS 20163, *44 (C.D. Cal., November 15, 1993) (citing cases).

a) EDG never registered securities with the Commission and no IPO was imminent.

Defendants repeatedly misrepresented unregistered Empire Securities as "registered" or on the road to becoming registered with the Commission. Letters to investors misrepresented that the "company has formulated plans to register" its shares, has "started the process that will ultimately see our company shares registered" and, most flagrantly, that "EDG is very pleased to announce that the company has registered with the Securities and Exchange Commission." (SoF ¶16-18) But Defendants never did register Empire Securities with the Commission, a fact that they admitted in responding to the Commission's complaint in this action. (SoF ¶8)

Defendants also wrote to investors repeatedly about purported plans for an IPO, stating that "Management plans to allow Investors the opportunity to transfer their Interest shares into potential Initial Public Offering (IPO) shares" and "[w]e anticipate that following the company's latest offering, we will be able to achieve public market status thru (sic) an Initial Public Offering (IPO)." (SoF ¶16, 18) But Ayngorn admitted he never had any expectation EDG would become a publicly traded company and does not recall even discussing any IPO with Straton. (Ayngorn 146-47). Defendants' misrepresentations about registering securities and planning for an IPO are actionably false. See, e.g., SEC v. Hasho, 784 F. Supp 1059, 1109 (S.D.N.Y 1992) (statements about a future IPO and baseless price predictions violate the antifraud provision of the federal securities laws even when posed as opinion or possibility rather than as a guarantee).

b) EDG misrepresented institutional investors' "interest" in the Company.

In a June 1, 2006 letter to shareholders, EDG wrote that "Management is expecting the majority of the share allocations [in a new $50 million offering to go] primarily to institutional investments." (SoF ¶24) Months later, in a January 5, 2007 letter, Defendants boasted that

17

"Management is currently in negotiations with corporate counsel to achieve a large financial infusion thru [sic] *Pipeline Financing*, utilizing some of the financial communities [sic] biggest names." (SoF ¶25) These statements were simply false. Management never had any institutional investors lined up and was never "in negotiations" to attain any pipeline financing. Straton confessed that Defendants based these statements solely on corporate counsel's representation that he "had access to contacts that do pipeline financing." (Straton at 246) Defendants never even had any conversation with "any particular individuals [or] any particular [institutional investors] because [they] still thought it was slightly premature." (Id. at 245)

       c). <u>EDG misrepresented the Company's business activities.</u>

Perhaps most egregious among Defendants' many misrepresentations about EDG's business came in a January 6, 2006 letter to investors, which stated that the EDG's "acquisition phase is currently underway with *a series of development projects being finalized as we speak*." (SoF ¶21) But the record unequivocally demonstrates that there were <u>no</u> development projects being finalized at that time. When pressed, Straton testified that by "a series of projects" he actually meant one multi-unit project in Howell, New Jersey. (Straton at 225) But as Straton admitted, the Howell project was never even close to "being finalized" in January 2006 (or at any other time) – the Howell project "just wasn't feasible" because it would require an investment of approximately $4 million at a time when EDG was nearly broke. (Id. at 222)

Misstatements in the EDG's March 18, 2005 letter to investors are similarly confounding. Defendants' March 2005 letter stated that EDG had "targeted 16 potential profitable projects" and that "expected Revenue growth should exceed $18-21 Million with in (sic) 36 months of commercial operations, while achieving Working Capital in excess of $9-12 Million in that same time period." (SoF ¶19) But Defendants cannot identify <u>any</u> of the "16 potential profitable

projects" EDG claimed to have "targeted." (Straton at 167) EDG never placed a bid on any – let alone 16 – projects in or around March 2005. (Id. at 168) In fact, Straton was unable to identify any specific project EDG even considered and testified that he is unaware of any record – and none have been produced – that would identify any such project. (Id. at 168, 183) As for the lofty revenue growth figures presented in EDG's March 2005 letter, Straton admitted that these numbers were based on a fully subscribed $5 million offering, even though in March 2005 only a small fraction of the Company's $5 million offering was subscribed. (Id. at 163-64)

        d)  EDG never pursued investments in Florida, Nevada and California.

In a June 1, 2006 letter urging shareholders to increase their investments in EDG, the Company stated: "Management is actively pursuing plans to start developing projects in fast growing areas of Florida, Nevada and California." (SoF ¶23) But EDG never actively pursued any projects in Florida, Nevada or California. (Straton at 246-248) Straton told the Commission that by "actively pursuing plans," Defendants really "meant that if the additional financing was available to us, we definitely have an opportunity" to pursue such plans. (Id. at 248) But EDG did not tell investors that it had an opportunity "if" additional financing was available – EDG stated, falsely, that it was "actively pursuing plans" in these faraway states.

        4.    Defendants' Omission of Material Facts Also Constitutes Actionable Fraud.

Defendants' failure to disclose Straton's and Ayngorn's exorbitant "salaries" is also actionable. Straton and Ayngorn withdrew more than $1 million as compensation despite informing investors in December 2004 that they would "defer salary compensation by 70% until the company has established [sufficient] revenue growth." (SoF ¶13) Straton and Ayngorn pocketed this money – more than one-third of the total money raised through the Offerings – despite failing to develop and sell a single project for EDG.

Defendants also never disclosed to investors their decision to use Company funds to purchase property in Straton's and Ayngorn's names or their decision to allow the Individual Defendants to utilize those properties as their personal residences – something Ayngorn confessed he had been doing, rent-free, with the Brooklyn Property for many months (Ayngorn at 6-7) and Straton told a Town Board was his intention for the Fairlawn Property. (SoF ¶26)[10] Likewise, Defendants never disclosed an arrangement the Company apparently had with Ayngorn's father that sent at least $200,000 of investors' money to his companies despite the apparent absence of any agreement between Ayngorn's father and EDG. (SoF ¶22; Straton at 226-27)

The Company also opted not to disclose that Straton was sued by the New York State Attorney General's Office in 1996 for fraud and misappropriation in connection with the offer and sale of stock of a defunct corporation. (SoF ¶4) On September 4, 1996, Straton consented to a judgment enjoining him from engaging in fraudulent practices and prohibiting him from offering, selling, or promoting any securities within or from New York State until and unless full restitution was paid to defrauded investors. (Id.) This is precisely the kind of information that a reasonable investor would want to know as part of the total mix of available information when considering whether to invest in a company like EDG. See Breard v. Sachnoff & Weaver, Ltd., 941 F.2d 142, 144 (2d Cir. 1991) ("[F]ailure to mention [partnership's counsel's] conviction in the initial offering memorandum could be considered reckless as a matter of law."). But the Commission has found no mention of Straton's run in with the law – more specifically, securities law – in any of the letters or memoranda sent by Defendants to potential or actual investors.

---

[10] EDG's failure to obtain a Certificate of Occupancy for the Brooklyn Property, which Ayngorn testified was part of an intentional effort to "sail through" the permitting process and avoid "those expenses of filing with the Buildings Department" (Ayngorn at 86), further illustrates the lack of any legitimacy to Defendants' purported business.

**C.    The Court Should Permanently Enjoin Defendants from Future Securities Law
Violations and Order Disgorgement and Monetary Penalties.**

The Commission seeks permanent injunctions against future violations of the federal

securities laws against all Defendants, disgorgement of ill-gotten gains plus payment of

prejudgment interest thereon, and an award of civil monetary penalties.

1.    The Court Should Issue a Permanent Injunction.

"A District Judge is vested with a wide discretion when an injunction is sought to prevent

future violations of the securities laws." SEC v. Martino, 255 F. Supp. 2d 268, 289 (S.D.N.Y.

2003) (citations omitted). "[T]o award a permanent injunction a court must find (1) past

violations of the securities laws and (2) a reasonable probability of future violations." SEC v.

McCaskey, No. 98 CIV. 6153 (SWK), 2001 WL 1029053, at *5 (S.D.N.Y. Sept. 6, 2001).

As set forth in detail above, Defendants' past violations of securities laws cannot

reasonably be gainsaid. "In addressing the probability of future infractions, the Second Circuit

has articulated several relevant factors including: (1) scienter; (2) the isolated or persistent nature

of the past fraudulent acts; (3) the defendant's recognition of the wrongful nature of the past

conduct; and (4) the defendant's ability to commit future violations." Id. (citations omitted).

Here, Straton's and Ayngorn's scienter is made abundantly clear by, inter alia, repeated

misrepresentations to investors about (i) an IPO Defendants knew was unlikely to ever occur; (ii)

purportedly ongoing business activity that was not in fact occurring; and (iii) the availability of

institutional investors to whom Defendants had never even spoken. (See supra at III.B.3).

Defendants' clandestine use of EDG funds for personal expenses and the placement of property

purchased with investors' money in the Individual Defendants' (or their wives') names provide

additional insight into the Individual Defendants' culpable state of mind.

Notably, Defendants perpetrated their fraud over several years and two separate

Offerings, stopping only when the Commission brought their actions to this Court's attention.

The Individual Defendants also testified about apparently improper sales of securities as part of

jobs held prior to creating EDG. And as noted above, Straton has already been disciplined for

prior securities-related misconduct. See SEC v. Batterman, No. 00 Civ. 4835 (LAP), 2002 WL

31190171, at *9 (S.D.N.Y. Sept. 30, 2002) (defendant's previous conviction and regulatory

sanctions support likelihood defendant would continue to engage in similar acts). Additionally,

Defendants have demonstrated no recognition of the wrongful nature of their conduct. And the

ease with which Defendants perpetrated the instant fraud makes clear how easily Defendants

could take advantage of other unsuspecting investors through similar scams.

Consequently, the Commission urges this Court to make permanent the injunctive relief

imposed on a preliminary basis through this Court's June 12, 2007 Order.

      2.    <u>The Court Should Order Defendants to Disgorge Their Ill-Gotten<br>Gains and Order Payment of Prejudgment Interest.</u>

The Commission seeks disgorgement of Defendants' profits from the fraud in the amount

of $2.9 million in addition to pre-judgment interest. Disgorgement is an appropriate means of

"forcing a defendant to give up the amount by which he was unjustly enriched." CFTC v.

Commonwealth Chemical Secs., Inc., 574 F.2d 90, 102 (2d Cir. 1978).

Defendants seemingly squandered investors' money on everything other than EDG's

interests. Straton and Ayngorn paid themselves more than $1 million despite an express promise

not to do so; some portion of investors' money (not specified in Defendants' discovery

responses) was paid to salespeople who were not registered (Nazon at 23) – and therefore not

permitted – to sell Empire Securities; more than $200,000 was paid to Ayngorn's father despite

the absence of any contract with EDG; and some additional sum appears to have been spent to

cover mortgages on properties purchased in Straton's and Ayngorn's names. Thousands of

additional dollars simply have not been accounted for. (SoF ¶7)

As co-participants in the fraudulent scheme, Defendants should be held jointly and

severally liable for the full amount of disgorgement plus prejudgment interest thereon. SEC v.

First Jersey Securities, Inc., 101 F.3d 1450, 1474 (2d Cir. 1996) ("[W]here a firm's . . . owner

and chief executive officer has collaborated in [unlawful] conduct and has profited from the

violations . . . the court [may] determine that the owner-officer too should be subject, on a joint

and several basis, to the disgorgement order.")

The Second Circuit has explained when prejudgment interest is appropriate:

> In deciding whether an award of prejudgment interest is warranted,
> a court should consider (i) the need to fully compensate the
> wronged party for actual damages suffered, (ii) considerations of
> fairness and the relative equities of the award, (iii) the remedial
> purpose of the statute involved, and/or (iv) such other general
> principles as are deemed relevant by the court. In an enforcement
> action brought by a regulatory agency, the remedial purpose of the
> statute takes on special importance.

First Jersey Securities, 101 F.3d at 1476 (citations omitted). The Commission respectfully

submits that all of these factors favor awarding prejudgment interest in this matter.

3.    The Court Should Order Defendants to Pay Civil Monetary Penalties.

"Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the

Exchange Act, 15 U.S.C. § 78u(d), provide for the imposition of civil penalties, for any violation

of the Act involving 'fraud, deceit, manipulation, or deliberate or reckless disregard of a

regulatory requirement' that 'resulted in ... or created a significant risk of substantial losses.'"

SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007). Here, "[d]isgorgement

alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to

keep the profits if she is not detected, and requires only a return of ill-gotten gains if she is

caught." SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159 (GEL), 2002 WL 1968341, at *4

(S.D.N.Y. Aug. 23, 2002). "Civil penalties are designed to punish the individual violator and

deter future violations of the securities laws." SEC v. Haligiannis, 470 F. Supp. 2d 373, 386

(S.D.N.Y. 2007); see also SEC v. Moran, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).

To determine what civil penalties should be imposed, "courts look to a number of factors,

including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's

scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial

losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5)

whether the penalty should be reduced due to the defendant's demonstrated current and future

financial condition." Opulentica, 479 F. Supp. 2d at 331. Where, as here, the only factor that

might potentially militate in a defendant's favor is an inability to pay, third tier penalties should

be imposed. See Inorganic Recycling Corp., 2002 WL 1968341, at *4 ("[Defendant]'s claims of

poverty cannot defeat the imposition of a disgorgement order or civil penalty.")

Natural persons whose securities law violations (1) involve fraud, deceit, manipulation,

or deliberate or reckless disregard of a regulatory requirement, and (2) directly or indirectly

result in substantial losses or create a significant risk of substantial losses to other persons are

subject to "third tier" penalties not to exceed the greater of $120,000 ($600,000 for corporations)

or the gross amount of defendant's pecuniary gain. 15 U.S.C. 78u(d)(3)(B)(iii).[11] Here, civil

penalties can be computed in two ways. One way for the Court to calculate an appropriate civil

penalty is to multiply the number of Defendants' securities law violations by the maximum per

violation amount, $120,000, or any other per violation figure the Court deems appropriate. See

---

[11] "First tier" violations are violations without any additional qualifications; "second tier" violations are those involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77u(d)(3)(B)(i-ii).

generally SEC v. Invest Better 2001, 01-Civ.-11427 (BSJ), 2005 WL 2385452, at *4 (S.D.N.Y.

May 4, 2005) (discussing calculation of civil penalties in securities fraud action) (citing SEC v.

Credit Bancorp, Fed. Sec. L. Rep. (CCH) ¶ 92,021 (S.D.N.Y. 2002)); see also Kenton Capital,

Ltd., 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (multiplying third tier penalty amount by number

of investors victimized by violation). Alternatively, the Court might choose to set the penalty

based on the gross amount of Defendants' ill-gotten gains, which in this case amounts to the

approximately $2.9 million collected from investors for worthless shares in a bogus company.

As set forth above, Defendants' egregious and repeated securities law violations warrant

nothing less than the maximum penalty the law will allow for each defendant.

## CONCLUSION

The record in this case overwhelmingly and unequivocally demonstrates that Defendants

have violated Sections 5(a), 5(c) and 17(a) of the Securities Act and Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder. As such, and because there are no

genuine issues of material fact in dispute, the Commission respectfully requests that its motion

for summary judgment be granted in full as a matter of law.

Dated: New York, NY
     September 12, 2007

Respectfully submitted,

By: _Doria G. Stetch_

Doria G. Stetch (DS-3307)
ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-1020

Of Counsel:
Meaghan Cheung
Michael Paley
Michael Birnbaum

Counsel of Record:
Mark K. Schonfeld (MS-2798)
Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-1020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
**SECURITIES AND EXCHANGE COMMISSION,**    :
                                                        :
                    **Plaintiff,**                      :
                                                        :
         **-against-**                                  :
                                                        :    **07 Civ. 3896 (PKC)**
**EMPIRE DEVELOPMENT GROUP, LLC.,**       :
**EMPIRE DEVELOPMENT GROUP FUND I, LLC,** :
**CASTLE HILL VENTURES, LLC,**            :
**FELIX STRASHNOV a/k/a FELIX STRATON and** :
**MICHAEL AYNGORN,**                      :
                                                        :
                    **Defendants.**                     :
                                                        :
------------------------------------------------------------------------x

### PLAINTIFF'S NOTICE TO *PRO SE* LITIGANTS PURSUANT TO LOCAL RULE 56.2

The Plaintiff in this case has moved for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure. This means that the defendant has asked the court to decide

this case without a trial, based on written materials, including affidavits, submitted in support of

the motion. THE DEFENSES YOU ASSERT MAY BE DENIED WITHOUT A TRIAL IF

YOU DO NOT RESPOND TO THIS MOTION by filing sworn affidavits and other papers as

required by Rule 56(e) of the Federal Rules of Civil Procedure and by Local Rule 56.1. An

affidavit is a sworn statement of fact based on personal knowledge that would be admissible in

evidence at trial. The full text of Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1 is attached.

In short, Rule 56 provides that you may NOT oppose summary judgment simply by relying upon your response to plaintiff Securities and Exchange Commission's complaint. Rather, you must submit evidence, such as witness statements or documents, countering the facts asserted by the plaintiff and raising material issues of fact for trial. Any witness statements must be in the form of affidavits. You may submit your own affidavit and/or the affidavits of others. You may submit affidavits that were prepared specifically in response to plaintiff's motion for summary judgment.

If you do not respond to the motion for summary judgment on time with affidavits or documentary evidence contradicting the material facts asserted by the plaintiff, the court may accept plaintiff's factual assertions as true. Judgment may then be entered in plaintiff's favor without a trial.

If you have any questions, you may direct them to the Pro Se Office.

Dated: New York, NY
       September 12, 2007

Respectfully submitted,

By: _Doria G. Stetch_

Doria G. Stetch (DS-3307)
ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-1020

Counsel of Record:
Mark K. Schonfeld (MS-2798)
Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Room 4300
New York, NY  10281
(212) 336-1020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,            :
                                                                                  :
                          Plaintiff,                                      :
                                                                                  :
        -against-                                                         :
                                                                                  :            07 Civ. 3896 (PKC)
EMPIRE DEVELOPMENT GROUP, LLC.,              :
EMPIRE DEVELOPMENT GROUP FUND I, LLC,   :
CASTLE HILL VENTURES, LLC,                        :
FELIX STRASHNOV a/k/a FELIX STRATON and   :
MICHAEL AYNGORN,                                      :
                                                                                  :
                          Defendants.                                   :
                                                                                  :
------------------------------------------------------------------------x

**PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiff Securities and Exchange Commission (the "Commission") submits this statement of material, undisputed facts in support of its motion for summary judgment against defendants Empire Development Group, LLC ("EDG," or the "Company"), Empire Development Group Fund I, LLC ("EDGFI"), Castle Hill Ventures, LLC ("Castle Hill"), Felix Strashnov ("Straton") and Michael Ayngorn (collectively, "Defendants").

**Relevant Parties**

1.    On October 15, 2004, Ayngorn and Straton created Castle Hill Ventures, LLC, a Delaware limited liability company. See Ex. 1 to accompanying September 12, 2007 Declaration of Michael D. Birnbaum ("Birnbaum Decl."), Nov. 1, 2004 Private Placement Memorandum at 11.[1]

2.    On or around October 4, 2006, Castle Hill changed its name to Empire Development Group, LLC.  Ex. 2, Oct. 23, 2006 Private Placement Memorandum at 1.

3.    EDG's office was located at 1795 Coney Island Avenue, Brooklyn, New York, 11230.  Ex. 3, Jan. 30, 2006 Ltr. from EDG to Shareholders at 1.

4.    In July 1996, Straton was sued by the New York State Attorney General's Office for fraud and misappropriation based on the offer and sale of stock of a defunct New Jersey corporation.  Ex. 4, July 2, 1996 Complaint against, inter alia, Straton.  On September 4, 1996, Straton consented to a judgment enjoining him from engaging in fraudulent practices and prohibiting him from offering, selling, or promoting any securities within or from New York State until and unless full restitution was paid to defrauded investors.  See Ex. 5, Docket Sheet in Attorney General Action.  Empire never disclosed to investors any information concerning the New York State Attorney General's Office's claim against Straton or the resulting securities ban. See Birnbaum Decl. ¶8.

---

[1] All "Ex. __" references are to documents attached to the accompanying Declaration of Michael D. Birnbaum.

**Defendants' Securities Offerings**

5.      Defendants sold securities in EDGFI and EDG (collectively, "Empire Securities") through two offerings (the "Offerings"). Defendants issued a private placement memorandum ("PPM") on or around November 1, 2004 stating their intention to raise $5 million through the sale of "membership interests" in EDGFI. See Ex. 1. Defendants issued a second PPM on or around October 23, 2006 announcing their plan to offer $25 million worth of securities in EDG. See Ex. 2.

6.      In their PPMs, Defendants identified the "units" in EDGFI and EDG available to the public as "securities." Ex. 1, cover page; Ex. 2, cover page.

7.      In total, Defendants raised approximately $2.9 million through investments in the Offerings. Ex. 6, June 25, 2007 Updated EDGFI Verified Accounting at 3. Defendants have not accounted for the entirety of this $2.9 million. See generally, Ex. 6.

**Section 5 Violations**

8.      Defendants never registered any Empire Securities with the Commission or any other regulatory body. Birnbaum Decl. ¶10; see also Ex. 7, EDG's July 6, 2007 Answer to the Commission's Complaint at 1, admitting that, as per paragraph 18 of the Complaint, "EDGFI commenced an unregistered offering of securities to its investors"; id. at 4, failing to deny that, as per paragraph 35 of the Complaint, "EDG and EDGFI did not file a registration statement for their sales of securities, and a registration statement was not otherwise in effect."

9.      Defendants declare in both the 2004 and 2006 PPMs that Defendants' sales are exempt from registration under Section 4(2) of the Securities Act and Rule 506 of Regulation D. (Ex. 1 at ii; Ex. 2 at ii)

2

investors. See, e.g., Exs. 8, 9 and 10, reflecting income and assets of investors that fail to meet the thresholds for an "accredited investor." Defendants sold securities to some investors without even receiving those investors' completed questionnaires, the very documents Defendants needed to review in order to determine whether an investor was accredited. See, e.g., Ex. 10, sample questionnaire responses from EDG investors.

11.     Defendants' improper solicitation of investors utilized interstate mail and telephone calls to individuals throughout the United States. (See Ex. 7, EDG Answer at ¶ 8.)

**Fraudulent Misrepresentations and Omissions**

12.     Defendants announced in the 2004 and 2006 PPMs that they planned to use offering proceeds to conduct (i) real estate market research and project feasibility studies, (ii) the acquisition of raw land and improved parcels, (iii) development expenses, including without limitation legal services, architectural services, engineering services, building materials, building contractor services and other labor, and finance-related costs, (iv) liability and other insurance premiums, (v) unit marketing expenses, and (vi) general working capital including salaries payable to the chief executives Straton and Ayngorn. Ex. 1 at 14; Ex. 2 at 3-4, 11.

13.     Defendants wrote numerous letters to potential and actual investors in which material misrepresentations abound. In a December 8, 2004 letter to investors, Defendants stated that Ayngorn and Straton had "elected to defer salary compensation by 70% until the company has established enough revenue growth to allow management to draw salaries without affecting the overall business plan of the company." Ex. 11, Dec. 8, 2004 Letter. Defendants' 2004 PPM represented that Ayngorn's and Straton's salaries would not exceed $240,000 annually and would be paid in exchange for services rendered to the Company. (Ex. 1 at 51)

3

14.     Notwithstanding Defendants' salary-related representations in their December 8,

2004 letter, Ayngorn and Straton drew more than $1 million of investors' money for their own

and their families' accounts.  Ex. 12, Ayngorn's Updated Verified Accounting at 2; Ex. 13,

Straton's Updated Verified Accounting at 3.

15.     The 2006 PPM does not mention any challenges Ayngorn's problems may have

presented for the Company.  (See generally Ex. 1)

16.     Defendants repeatedly misled investors concerning steps toward becoming a

public company.  For example, in their September 8, 2005 letter to investors, Defendants stated:

> The company has formulated plans to register the Empire
> Development Group (EDG) Real Estate Fund with the Securities
> and Exchange Commission (SEC).  By becoming a publicly
> reporting company (sic) we will allow Investors complete financial
> transparency with audited financials.  Also, by achieving reporting
> company status we take the next step forward to potentially
> becoming a publicly traded company in the future.  With this in
> mind, Management plans to allow Investors the opportunity to
> transfer their Interest shares into potential Initial Public Offering
> (IPO) shares when the company has established a future publicly
> traded market for its shares.

Ex. 14, Sept. 8, 2005 Letter.

17.     Several weeks later, Defendants shared similar misinformation with investors:

> EDG is very pleased to announce that the company has registered
> with the Securities and Exchange Commission as well as filing
> with the New York State Securities Investor Protection & Real
> Estate Financing Bureau. . . . .  These registrations are the first
> major step to allow EDG to achieve Public Market status for the
> company's shares.

Ex. 15, Nov. 2, 2005 Letter.

18.     And again, in January 2007, Defendants wrote:

> EDG has also started the process that will ultimately see our
> company shares registered and listed with the Securities &
> Exchange Commission (SEC).  We anticipate that following the

company's latest offering, we will be able to achieve public market
status thru (sic) an Initial Public Offering (IPO).

Ex. 16, Jan. 5, 2007 Letter at 2.

19.     Defendants also were not truthful in their representations regarding the
Company's business activities. For example, Defendants misinformed investors in March 2005
that EDG had "targeted 16 potential profitable projects" and that "expected Revenue growth
should exceed $18-21 Million with in (sic) 36 months of commercial operations, while achieving
Working Capital in excess of $9-12 Million in that same time period." Ex. 17, March 18, 2005
Letter at 1. Defendants' March 18, 2005 letter to investors never mentioned, however, that
"expected" growth meant only what was possible if the Company obtained millions more
investment dollars than it had been able to collect from investors to date. See Ex. 17.

20.     Defendants admit that their so-called "expectations" were not achievable without
a fully subscribed EDGFI offering, but when Defendants sent their March 18, 2005 letter to
investors, Defendants had not even sold half of the securities made available in their EDGFI
offering. Birnbaum Decl. at ¶22.

21.     On January 6, 2006, Defendants wrote that EDG's "acquisition phase is currently
underway with a series of development projects being finalized as we speak." Ex. 18, Jan. 6,
2006 Letter at 1.

22.     In the same January 2006 letter, Defendants also represented, incorrectly, that
"[w]e have partnered with one of the leading builders in the Northeast." Ex. 18 at 1. What
Defendants meant by "one of the leading builders in the Northeast" was Ayngorn's father – to
whom Defendants paid more than $200,000, see Ex. 6, EDGFI's Updated Verified Accounting at
5 – without ever disclosing to investors that the Company had hired, let alone paid so many
thousand of dollars to, Ayngorn's father.

23.     Yet another material misrepresentation to investors can be found in Defendants

June 1, 2006 letter, when they claimed, despite having no plans to expand beyond the New York

tri-state area, that "Management is actively pursuing plans to start developing projects in fast

growing areas of Florida, Nevada and California." Ex. 19, June 1, 2006 Letter at 2.

24.     Defendants also misled investors about purportedly available, but actually non-

existent, financing from "institutional investors." In their June 1, 2006 letter, Defendants stated

that "Management is expecting the majority of the share allocations [in a new $50 million

offering] going primarily to institutional investments." Ex. 19 at 1.

25.     On January 5, 2007, Defendants again wrote to investors boasting that

"Management is currently in negotiations with corporate counsel to achieve a large financial

infusion thru [sic] *Pipeline Financing*, utilizing some of the financial communities [sic] biggest

names." Ex 16 at 2.

26.     Additionally, contrary to any disclosures made to investors, Straton told a Town

Board that he intended to use the Fairlawn Property as his personal residence, Ex. 20, Transcript

of January 22, 2007 hearing, at 9-10, and commissioned blueprints for the property that called

the Fairlawn Property the "Strashnov Residence."

Dated: New York, NY
           September 12, 2007                    Respectfully submitted,


                                                 By: _Doria G. Stetch_

                                                 Doria G. Stetch (DS-3307)
                                                 ATTORNEY FOR PLAINTIFF
                                                 SECURITIES AND EXCHANGE COMMISSION
                                                 New York Regional Office
                                                 3 World Financial Center
                                                 New York, New York 10281
                                                 (212) 336-1020

6

Of Counsel:

Meaghan Cheung
Michael Paley
Michael Birnbaum

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Plaintiff,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　-against-　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:　　07 Civ. 3896 (PKC)
EMPIRE DEVELOPMENT GROUP, LLC　　　　　　:
EMPIRE DEVELOPMENT GROUP FUND I, LLC　　:
CASTLE HILL VENTURES, LLC,　　　　　　　　:
FELIX STRASHNOV a/k/a FELIX STRATON and　:
MICHAEL AYNGORN,　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Defendants.　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:

------------------------------------------------------------------x

## DECLARATION OF MICHAEL D. BIRNBAUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1.　　　I, Michael D. Birnbaum, pursuant to 28 U.S.C. 1746, declare as follows:

2.　　　I am over 18 years of age and am employed as an attorney in the enforcement division in

the New York Regional Office of the Securities and Exchange Commission ("Commission"). I

submit this Declaration in support of the Commission's Motion for Summary Judgment in the

above-captioned matter.

3.　　　I make this Declaration based upon personal knowledge, information and belief. The

sources of my information and the bases of my belief are documents produced by the Defendants

to the Commission staff since this Court issued the Temporary Restraining Order (TRO) on May

18, 2007, Defendant EDG's written responses to the Commission's document requests and my

review of testimony by Straton and Ayngorn, at their depositions on May 29, 2007 and May 30,

2007.

4.    Attached hereto as Exhibit 1 is a true and correct copy of a November 1, 2004 Private Placement Memorandum published by Defendants in this action.

5.    Attached hereto as Exhibit 2 is a true and correct copy of an October 3, 2006 Private Placement Memorandum published by Defendants in this action.

6.    Attached hereto as Exhibit 3 is a true and correct copy of a January 30, 2006 letter from Defendants addressed to shareholders.

7.    Attached hereto as Exhibit 4 is a true and correct copy of a July 2, 1996 Complaint pursuing an action against, inter alia, Defendant Felix Straton.

8.    Attached hereto as Exhibit 5 is a true and correct copy of a docket sheet in an action brought by the Office of the Attorney General of New York State against, inter alia, Defendant Felix Straton, reflecting a consent judgment to which Straton is a party. Empire never disclosed to investors any information concerning the New York State Attorney General's Office's claim against Straton or resulting securities ban.

9.    Attached hereto as Exhibit 6 is a true and correct copy of an Updated EDGFI Verified Accounting submitted by EDGFI in connection with this action.

10.    Defendants never registered any Empire Securities with the Commission or any other regulatory body.

11.    Attached hereto as Exhibit 7 is a true and correct copy of EDG's July 6, 2007 Answer to the Commission's Complaint, including a copy of the Commission's Complaint attached thereto

12.    Attached hereto as Exhibits 8, 9 and 10 are true and correct copies of completed questionnaires submitted to Defendants by investors William Kolb, Robert Landrus and Theodore Lutjen, respectively, reflecting assets that failed to meet the thresholds established under the federal securities laws for "accredited investors."

2

13.     A review of investments in EDG reflects numerous investments from individuals for whom no questionnaire was produced by Defendants in this action.

14.     Attached hereto as Exhibit 11 is a true and correct copy of a December 8, 2004 letter from Defendants to investors.

15.     The documents produced by Defendants in connection with this litigation do not reflect any revenue earned by Defendants at any time since the EDG or EDGFI's inception.

16.     Attached hereto as Exhibit 12 is a true and correct copy of Defendant Ayngorn's Updated Verified Accounting dated June 18, 2007.

17.     Attached hereto as Exhibit 13 is a true and correct copy of Defendant Straton's Updated Verified Accounting dated June 18, 2007.

18.     Attached hereto as Exhibit 14 is a true and correct copy of a September 8, 2005 letter from Defendants to investors.

19.     Attached hereto as Exhibit 15 is a true and correct copy of a November 2, 2005 letter from Defendants to investors.

20.     Attached hereto as Exhibit 16 is a true and correct copy of a January 5, 2007 letter from Defendants to investors.

21.     Attached hereto as Exhibit 17 is a true and correct copy of a March 18, 2005 letter from Defendants to investors.

22.     Documents produced by Defendants indicate that as of March 18, 2005, Defendants had sold fewer than half of the securities made available in Defendant's first offering.

23.     Attached hereto as Exhibit 18 is a true and correct copy of a January 6, 2006 letter from Defendants to investors.

3

24.     Attached hereto as Exhibit 19 is a true and correct copy of a June 1, 2006 letter from Defendants to investors.

25.     Attached hereto as Exhibit 20 is a true and correct copy of relevant portions of a transcript of the January 22, 2007 hearing held by the Fairlawn, New Jersey Town Board.  The Commission staff viewed blueprints for the Fairlawn Property titled "Strashnov Residence."

26.     Attached hereto as Exhibit 21 is a true and correct copy of the deposition transcript for Michael Ayngorn taken in connection with this matter.

27.     Attached hereto as Exhibit 22 is a true and correct copy of the deposition transcript for Felix Straton taken in connection with this matter.

28.     Attached hereto as Exhibit 23 is a true and correct copy of relevant pages of the deposition transcript of Al Nazon taken in connection with this matter.

29.     Pursuant to 28 U.S.C. §1746, I, Michael D. Birnbaum, declare under penalty of perjury that the foregoing is true and correct.

Executed on September _11_, 2007
New York, New York


Michael D. Birnbaum

4