UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                     Plaintiff,                         07 Civ. 3896 (PKC)

        -against-

                                            MEMORANDUM
                                            <u>AND ORDER</u>

EMPIRE DEVELOPMENT GROUP, LLC, EMPIRE
DEVELOPMENT GROUP FUND I, LLC, CASTLE
HILL VENTURES, LLC, FELIX STRASHNOV
a/k/a FELIX STRATON and MICHAEL
AYNGORN,

                     Defendants.
----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

               Plaintiff Securities and Exchange Commission ("SEC") moves for summary

judgment on claims for violations of Sections 5(a), 5(c) and 17(a) of the Securities Act of

1933 (15 U.S.C. §§77e(a), 77e(c), 77q(a)), Section 10(b) of the Exchange Act of 1934 (15

U.S.C. §78j(b)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5). The

SEC seeks monetary penalties, disgorgement and a permanent injunction enjoining

defendants from future securities laws violations. Defendant Empire Development

Group, LLC ("EDG"), formerly known as Castle Hill Ventures, LLC ("Castle Hill"), opposes

plaintiff's motion, contending that issues of material fact preclude summary judgment.

Defendants Empire Development Group Fund I, LLC (the "Fund"), Felix Strashnov a/k/a

Felix Straton and Michael Ayngorn have not filed an opposition to plaintiff's motion. For

the reasons outlined below, plaintiff's motion is granted with respect to the Sections 5(a)

and 5(c) claims and granted in part and denied in part with respect to the Sections 17(a),

10(b) and Rule 10b-5 claims.

I.    <u>Background</u>

Because defendants are the non-movants, I accept defendant EDG's version of the facts and such other facts tendered by the plaintiff that are not disputed by defendants. All reasonable inferences are drawn in defendants' favor.

Defendants Felix Strashnov and Michael Ayngorn (together the "Individual Defendants") created Castle Hill in October 2004 which was later renamed Empire Development Group, LLC. The Individual Defendants each held a 50% interest in the company. (Birnbaum Decl., Exh. 1 at 11; Strashnov Tr. at 44-45.) Castle Hill (and later, EDG) was the general partner of the Fund, a real estate investment entity that was to be funded through the investments of high net worth, accredited investors. (Strashnov Tr. at 60, 65.)

Prior to the creation of Castle Hill, Strashnov was sued by the New York State Attorney General's Office in 1996 for fraud and misappropriation in connection with the offer and sale of a defunct corporation's stock. (Birnbaum Decl., Exh. 4.) On September 4, 1996, Strashnov signed a consent judgment enjoining him from engaging in fraudulent practices and prohibiting him from offering, selling, or promoting any securities within or from New York State until and unless full restitution was paid to defrauded investors. (<u>Id.</u>, Exh. 5.)

On November 1, 2004, defendants, with the assistance of a non-party corporate attorney, issued a private placement memorandum ("PPM") with the stated intention of raising $5 million through the sale of 100 membership interest units at $50,000 per unit. (Birnbaum Decl., Exh. 1.) The PPM described the Fund as being in the business of "identifying and exploiting . . . residential real estate investment opportunities

made possible through bank and/or other mortgage foreclosures." (Id. at 7.)  The "objective"
of the Fund was to "acquire units at below market prices whenever possible" and sell them
for a profit after rehabilitating them.  (Id.)  The PPM stated that the offering was "made in
reliance upon the availability of an exemption from the registration provisions of the
Securities Act . . . It is intended that this offering comply with the provisions of section
4(2) of the Securities Act and Rule 506 of Regulation D. . . ." (Id., Exh. 1 at ii.)

       A second PPM was issued in October 2006 and offered $25 million of
securities in EDG itself, rather than in the Fund of which EDG was the general partner.
(Id., Exh. 2.)  The October 2006 PPM described EDG as "an enterprise focused on real
estate acquisition, development and related activities" and noted that "[t]o date, our sole
activities have related to our role as the Managing Member of Empire Development
Group Fund I, LLC . . . ." (Id., Exh. 2 at 1.)  Like the November 2004 PPM, the October
2006 PPM relied on a registration exemption under Section 4(2) of the Securities Act and
Rule 506 of Regulation D.  (Id., Exh. 2 at ii.)  As such, the securities offered pursuant to
both PPMs (together the "EDG Securities") were never registered with the SEC.
(Birnbaum Decl. ¶ 10.)

       Within both PPMs, defendants included a business plan which stated that
monies raised from selling EDG Securities would be used for: 1) real estate market
research and project feasibility studies; 2) the acquisition of raw land and improved
parcels; 3) development expenses, including without limitation legal services,
architectural services, engineering services, building materials, building contractor
services and other labor, and finance-related costs; 4) liability and other insurance

premiums; 5) unit marketing expenses, and 6) general working capital, including salaries. (Id., Exhs. 1 at 14, 2 at 3-4, 11.)

EDG and the Fund employed the Individual Defendants, a secretary/receptionist and several temporary employees who were used to solicit investments by telephone. (Strashnov Tr. at 79; Ayngorn Tr. at 46-48.) Investments were solicited by calling people throughout the United States who appeared on a list purchased from a marketing company called Code Busters. (Ayngorn Tr. at 53; Strashnov Tr. at 78-80.) The list provided by Code Busters was to have contained only accredited investors of high net worth because EDG "requested [from Code Busters]. . . four to 5,000 names of accredited, high net worth individuals that worked or had expressed interest at least in some point in real estate. . . ." (Strashnov Tr. at 65.) Other than the Code Busters list, EDG used no other means to identify and solicit potential investors.[1] (Id.)

If someone expressed interest in investing in the Fund or EDG, the PPMs were sent through the mail to that person. To ensure that those who conveyed an interest in investing in EDG or the Fund were accredited investors, potential investors were required to complete an investor questionnaire drafted by a corporate attorney engaged by EDG. (Id. at 66.) Ayngorn testified that he understood an accredited investor to be someone with a net worth of $1 million or more while Strashnov stated he believed that an accredited investor is a "high net worth individual[] . . . professional enough in the investment game to make a business decision upon the merits. . . ." (Id. at 66.) The Individual Defendants testified that EDG accepted investments from several non-

---

[1] Despite the "Code Busters" list being the sole source for defendants' solicitation of investors, EDG has informed the SEC that no copy of the list could be located and the list therefore would not be produced. (Birnbaum Supp. Decl. ¶¶ 8-9.)

accredited investors.  Ayngorn testified that he believed that EDG was "allowed

approximately 30, 35 nonaccredited investors" because that is what he was told by "the

corporate attorney." (Ayngorn Tr. at 141-42.)  Strashnov testified that EDG "did accept in

certain rare instances several individuals that were considered not accredited but were

sophisticated enough and obviously knew the risks involved." (Strashnov Tr. at 69.)

Three investors from which EDG accepted money, filled out the questionnaire and

indicated that they had a net worth of less than $500,000 and had an income of less than

$100,000 in the three years prior to their filling out the questionnaire.  (Birnbaum Decl.,

Exhs. 8, 9, 10.)  William A. Kolb, 92 years-old at the time he filled out the questionnaire,

indicated his net worth was less than $100,000 and that he made less than $60,000 in the

past three years.[2]  (Id., Exh. 8.)  Sixty-nine-year-old Robert Landrus, indicated his net

worth was between $200,000 and $300,000 and that his income had been at least $60,000

but less than $100,000 for each of the three years prior to his completing the

questionnaire.  (Id. Exh. 9.)  Theodore Lutjen's undated questionnaire indicates his net

worth was less than $500,000 and that he had made less than $100,000 in each of 2004,

2005 and 2006.  (Id. Exh. 10.)

Between 2004 and 2007, defendants raised a total of approximately $2.9

million by selling EDG Securities through the two offerings.  (Id., Exh. 6 at 3.)  During

that time period, EDG issued several letters to shareholders and potential investors

providing information regarding the status of the Fund and EDG's business.  Each of the

letters was drafted by Strashnov and cursorily reviewed by Ayngorn.  (Strashnov Tr. at

---

[2] Kolb, who invested $11,500 in EDG Securities, testified months after making those investments that,
although he did inherit certain assets from his wife (including a portion of what was once a $1 million
estate his wife had inherited from her brother), his net worth, excluding his home, was "much less" than
$500,000 "over the last three years."  (Kolb Tr. at 9, 42.)

56, 147, 159, 192, 212, 219.)  None of the letters were reviewed by the corporate attorney

used by EDG to draft the PPMs and the questionnaire.  (Id.)

        A December 8, 2004 letter to shareholders noted that "Management has

elected to defer salary compensation by 70% until the company has established enough

revenue growth to allow management to draw salaries without affecting the overall

business plan of the company." (Birnbaum Decl., Exh. 11.)  The 2004 PPM sated that

each of the Individual Defendants' salaries would not exceed $240,000 per year.  (Id.,

Exh. 1, at 51.)  Thus, deferring 70% of their salaries would have meant that each

Individual Defendant would receive $72,000 in salary per year.

        In a June 25, 2007 sworn statement, Strashnov stated that EDG was

paying each Individual Defendant approximately $15,000–20,000 per month up until

May 18, 2007.  (Id., Exh. 6 at 2.)  During the two-and-one-half-year period between the

November 2004 PPM and the date on which plaintiff filed this lawsuit, the Individual

Defendants received more than $1 million in total compensation from the proceeds of the

Fund and EDG offerings.  (Id., Exh. 12 at 2, 13 at 3.)  In total, Strashnov received

approximately $320,000 in salary and Ayngorn received approximately $710,000 in

salary.  (Id.)  Ayngorn received substantially more monetary compensation than

Strashnov because he made several withdrawals from the EDG accounts above and

beyond the agreed-upon amount to support his alcohol and gambling addictions.

(Ayngorn Tr. at 71; Strashnov Tr. at 52.)  Sometime in 2005, when Strashnov became

aware that Ayngorn was making substantial withdrawals to support his addictions, he

demanded Ayngorn's ATM card and destroyed it.  (Ayngorn Tr. at 71.)  He also told

Ayngorn several times that he needed to seek help to deal with his addictions.  (Strashnov

Tr. at 51-53.)  Ayngorn, however, simply ordered a new ATM card from the bank and continued withdrawing money.  (Id.; Ayngorn Tr. at 72.)  Ayngorn quit drinking and gambling in or around the end of March 2007 or two months prior to giving his May 30, 2007 testimony to the SEC.  (Ayngorn Tr. at 111-12.)

EDG sent a letter dated March 18, 2005 to investors and potential investors informing them that, among other things, EDG "had targeted 16 potential profitable projects, each property can yield profit margins from $65k to as high as $100k per project." (Birnbaum Decl., Exh. 17.)  The letter further stated that EDG "feel[s] that our expected [r]evenue growth should exceed $18-21 Million within 36 months of commercial operations, while achieving in Working Capital in excess of $9-12 Million in that same time period." (Id.)  Strashnov testified that he could not remember the addresses of any of the 16 properties mentioned in the letter, that no records exist identifying the 16 properties and that no bids were ever placed on any of those properties.  (Strashnov Tr. at 167-68.)  He further testified that the statements regarding expected revenue growth in the March 18, 2005 letter assumed that the Fund offering was fully subscribed and, because it was not, it would have been impossible to reach the numbers stated in the letter.  (Id. at 163-64.)  As of March 18, 2005, fewer than half of the Fund securities had been sold.  (Birnbaum Decl. ¶ 22.)

EDG issued a "News Release" and letter to investors dated September 8, 2005, which stated that

> [t]he company has formulated plans to register the Empire Development Group (EDG) Real Estate Fund with the Securities and Exchange Commission (SEC).  By becoming a publicly reporting company we will allow Investors complete financial transparency with audited financials. Also, by achieving reporting company status we take the next step forward to potentially becoming a publicly traded company in the future.

(Birnbaum Decl., Exh. 14.)  Less than two months later, EDG issued another "News Release" and letter stating that EDG "has registered with the Securities and Exchange Commission (SEC) . . . . These registrations are the first major step to allow EDG to achieve Public Market status for the company's shares." (Id., Exh. 15.)  The letter further informed shareholders that "Gross Revenue are [sic] expected to exceed 40 Million dollars within the next 5 years . . . as well as, growing Working Capital to over 20 Million dollars in the same time span." (Id.)

Although EDG did, through a corporate attorney, complete a Regulation D filing with the SEC, it never registered the EDG Securities.  (Birnbaum Decl. ¶ 10; Exh. 7 at 1.)  Strashnov testified that he was confused as to what it meant to register with the SEC and that he thought "the Reg D filing was in fact an SEC registration." (Strashnov Tr. at 213.)  Ayngorn testified that he did not believe there were any imminent plans for EDG to become a public company.  (Ayngorn Tr. at 146-47.)

On January 6, 2006, EDG sent a letter to shareholders and potential investors announcing that the "Fund's much anticipated acquisition phase is currently underway with a series of development projects being finalized as we speak." The letter further stated that

> [T]he first of these projects is valued at approximately $800K with
> potential profit to exceed $300-400K.  This project is the first step to our
> foray into full development construction. . . . We have partnered with one
> of the leading builders in the Northeast, to provide full in-house
> construction opportunities while decreasing the costs of outsourcing and
> sub-contracting.

(Birnbaum Decl., Exh. 18.)  The project referred to in the January 6, 2006 letter was a property in Fairlawn, New Jersey that the Individual Defendants purchased for $400,000 in or about January 2006.  (Strashnov Tr. at 219.)  Twenty percent of the $400,000

purchase price was paid for with investors' funds and the remainder was mortgaged in

Strashnov's name.  (Id. at 113-115.)  Strashnov testified that he valued the property at

$800,000 in the January 6, 2006 letter because he estimated the property needed

approximately $400,000 worth of development before it could be sold for a profit.  (Id. at

220.)  The property's deed was put in Strashnov's name rather than in the name of EDG or

the Fund because EDG could not get a mortgage at a reasonable rate and the Individual

Defendants did not want to tie up working capital by purchasing the properties outright.

(Id. at 113-14.)  For the same reason, a property in Brooklyn purchased in the latter part

of 2005 for approximately $600,000 (Strashnov Tr. at 112-115), was deeded to Ayngorn

and his wife, and then later deeded solely to Ayngorn's wife to avoid mechanics liens.

(Ayngorn Tr. at 96-98.)  The Brooklyn property was also mortgaged under Ayngorn and

his wife's name, and investor's funds were used to make the mortgage payments.  (Id. at

93.)  From the date of the initial PPM through the date the SEC filed this action, the only

real estate properties purchased in furtherance of EDG's and the Fund's stated business

plans were the Brooklyn property and the Fairlawn, New Jersey property.  (Strashnov Tr.

at 157.)  Neither of those properties were ever deeded to the Fund or EDG.

The "leading builder in the northeast" referred to in the January 6, 2006

letter was a company owned by Ayngorn's father called "Exclusive Homes."  (Strashnov Tr.

at 226-27.)  More than $200,000 was paid to Exclusive Homes for work done to both the

Fairlawn, New Jersey and Brooklyn properties.  (Birnbaum Decl., Exh. 6 at 5.)

On June 6, 2006, EDG sent another letter to shareholders announcing that

management had "begun formulating plans, to actively pursue several multi-property

development projects in the New York tri-state area.  (Birnbaum Decl., Exh. 19.)  Our

current focus is in Bergen County, New Jersey. . . . These price ranges allow us to achieve profit margins in excess of 400-600 thousand dollars per project." (<u>Id.</u>) The letter further announced "[p]lans for an additional round of financing . . . expected to be 50 million dollar[s]. . . . The offering will allow Management the capability to capture a commanding market share portion of the new construction development in the area." (<u>Id.</u>) In addition, the letter stated "Management is actively pursuing plans to start development projects in the fast growing areas of Florida, Nevada and California. (<u>Id.</u>) Strashnov testified that EDG was not actively pursuing any projects in those states because EDG did not have the requisite "additional financing" to pursue such projects. (Strashnov Tr. at 246-48.) With respect to pursuing the "mulit-property development projects in the New York tri-state area," Strashnov testified that EDG had "looked at several different lots that had potential to be subdividable, [but that] none of them realistically came out to be worthwhile." (<u>Id.</u> at 244.) He further explained he believed that looking at properties constituted "actively pursuing" such properties in accordance with the representation made in the June 6, 2005 letter. (<u>Id.</u>)

EDG sent another letter to shareholders on January 5, 2007, stating that management was "formulating plans to pursue a large Planned Unit Development (PUD) project, directly following the company's next round of financing." (Birnbaum Decl., Exh. 16.) The letter further announced that EDG "is currently in negotiations with corporate counsel to achieve a large financial infusion thru Pipeline Financing, utilizing some of the financial communities biggest names" and that "EDG has also started the process that will ultimately see our company shares registered and listed with the Securities & Exchange Commission (SEC). We anticipate that following the company's latest offering we will be

11

able to achieve public market status thru [sic] an Initial Public Offering . . . ." Strashnov testified the statement regarding pipeline financing was based on conversations he had with EDG's corporate attorney who told him "that if we did what we had to, he had access to what he deemed pipeline financing" and that "he had access to contacts that do pipeline financing." (Id. at 245.) Strashnov, however, never discussed financing with any institutional investors because he believed it was "premature." (Id. at 245-46.) Strashnov testified that his corporate attorney never told him how much financing he had access to and never pointed him to any specific institutional investors. (Id.)

The SEC filed the complaint in this action on May 18, 2007 and, by order to show cause of the same date, sought to, inter alia, freeze defendants' assets and temporarily enjoin them from violating securities laws. (Doc. #s 1, 2.) The Court granted the temporary relief sought by the SEC and, after a hearing, the temporary order was converted by the Court into a preliminary injunction. (Doc. # 14.)

In September 2007, the SEC moved for summary judgment. (Doc. # 31.) Defendant EDG opposed the motion on October 2, 2007. (Doc. # 30.) At a November 26, 2007 hearing, the Court was informed that the Individual Defendants had not filed and did not intend to file opposition to the SEC's summary judgment motion. (11/26/2007 Tr. at 8-9.) The Court inquired whether the Individual Defendants understood that "a summary judgment motion ha[d] been made in this case . . . by the SEC in which they seek judgment in their favor and if that motion is granted, then liability in this . . . civil enforcement suit brought by the SEC, will have been established." (Id. at 8.) The Individual Defendants both acknowledged that they understood. (Id. at 8-9.)

II.     Discussion

a.   Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.  It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief.  A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts asserted by the movant.  Rule 56(e)(2), Fed. R. Civ. P. In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  The Court must "view the evidence in the light most favorable to the non-moving party and draw all

reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotations and citations omitted); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants.  Rule 56(c), Fed. R. Civ. P.  In the absence of any disputed material fact, summary judgment is appropriate.  Id.

When a motion for summary judgment is unopposed, as it is here with respect to the Fund and the Individual Defendants, courts "must review the motion . . . and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law" because "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." Vt. Teddy Bear Co, 373 F.3d at 244-46 (internal quotation marks and citation omitted).  "Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement.  It must be satisfied that the citation to evidence in the record supports the assertion." Id. (citation omitted).

     b.   Section 5 of the Securities Act Claims

Section 5 of the Securities Act requires all non-exempt securities offered for sale to the public to be registered with the SEC prior to the offer or sale of such securities. <u>SEC v. Cavanagh</u>, 445 F.3d 105, 111 n.13 (2d Cir. 2006).[3] To state a claim under Section 5, plaintiff must show "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." <u>Id.</u> (internal quotation marks and citation omitted). Scienter is not an element of a Section 5 violation and ignorance of the registration requirement is not a proper Section 5 defense. <u>SEC v. Softpoint, Inc.</u>, 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997), <u>aff'd</u>, 159 F.3d 1348 (2d Cir. 1998) (citing <u>SEC v. Universal Major Indust. Corp.</u>, 546 F.2d 1044, 1047 (2d Cir. 1976)). If plaintiff makes out a <u>prima facie</u> case for a Section 5 violation, defendants then "bear[] the burden of proving the applicability of an exemption." <u>Cavanaugh</u>, 445 F.3d at 111 n.13 (citation omitted).

Here, there is no dispute as to whether the EDG Securities were registered – they were not. (Birnbaum Decl. ¶ 10.) There is also no dispute as to whether defendants offered and sold "securities" as that term has been broadly defined. <u>See</u> <u>Reves v. Ernst &</u>

---

[3] Section 5(a) provides:

    Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale. 15 U.S.C. § 77e.

Section 5(c) provides in relevant part:

    It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security . . . . <u>Id.</u>

<u>Young</u>, 494 U.S. 56, 65-66 (1990) ("[I]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'").  In addition, defendants do not dispute that interstate communication and the mails were used to offer and sell the EDG Securities; indeed they admit using the telephone and mail to solicit potential investors located throughout the United States. (Ayngorn Tr. at 53; Strashnov Tr. at 78-80.)  Plaintiff has thus established each element of a Section 5 claim.  It is therefore defendants' burden to establish that the EDG Securities were exempt from the registration requirement to avoid Section 5 liability.

True, both PPMs claim exemption under "the provision of section 4(2) of the Securities Act and Rule 506 of Regulation D," but the record does not support the applicability of those stated exemptions.

In relevant part, an "accredited investor" is defined by Regulation D to include:

> Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000; [and] [a]ny natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

17 C.F.R. § 230.501.

The Rule 506 exemption only applies with respect to unaccredited investors if they are provided with certain information from the issuer including financial statements.  17 C.F.R. § 230.502 (listing conditions that are "applicable to offers and sales made under Regulation D").  Rule 506 specifically requires "offers and sales . . . [to] satisfy all the terms and conditions of §§ 230.501 and 230.502," including a requirement that

unaccredited investors receive an audited balance sheet "dated within 120 days of the start of the offering . . . ." 17 C.F.R. § 230.506(b)(1), 230.502(b)(2)(B).

As noted, Strashnov testified that EDG Securities were sold to "several" unaccredited investors (Strashnov Tr. at 69), and Ayngorn testified that he believed the EDG Securities could be sold to a finite number of unaccredited investors. (Ayngorn Tr. at 141-42.) Neither of the Individual Defendants testified that unaccredited investors in EDG Securities were provided with financial statements or audited balance sheets. Although defendant EDG asserts that it "does not admit that it sold securities to unaccredited investors," that statement is a conclusory assertion insufficient to defeat summary judgment. See Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005) (summary judgment opponent "may not rely on conclusory allegations or unsubstantiated speculation") (quoting Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 428 (2d Cir. 2001)); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998) ("non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

The only "evidence" EDG provides in support of its assertion is its counsel's unsworn statement of his recollection that a single investor, William A. Kolb, "admitted" during his SEC testimony that he had inherited a significant amount of money from his wife in excess of four million dollars." (EDG 56.1 Stmnt. ¶ 10.) That recollection is contrary to the record. Kolb, in fact, testified that his brother-in-law "was awarded $4 million" in a litigation after becoming paralyzed but, after various payouts, he (Kolb's brother-in-law) ultimately received "under a million." (Kolb Tr. at 42.) Kolb further testified that when his wife died, half of the money she inherited from her brother went to

the deceased brother's sister-in-law. (<u>Id.</u>) In addition, Kolb stated that the portion of his

brother-in-law's estate that he ultimately received from his wife's estate "included all types

of stocks and things . . . [that] probably all went down one after the other after the other."

(<u>Id.</u>) As noted, Kolb also stated during his SEC testimony that his net worth, other than

his house, was "[m]uch less" than "half a million." (<u>Id.</u> at 9.) Defense counsel's incorrect

recollection of a single investor's testimony regarding his financial status is insufficient to

show that there exists a genuine issue for trial.

　　　　Other than defense counsel's incorrect recollection of one investor's

testimony, EDG offers nothing to contradict the evidence put forward by the SEC that

defendants offered and sold securities to unaccredited investors. Uncontradicted

evidence of defendants' offers and sales of EDG Securities to unaccredited investors

without providing those investors with the required information render the exemption

under Rule 506 unavailable.

　　　　Nor is a Section 4(2) exemption available on these facts. Section 4(2) of

the Securities Act expressly states that its exemption is applicable only to "transactions by

an issuer not involving any public offering." 15 U.S.C. § 77d(2). That limitation is

grounded in the principle that certain nonpublic investors can have access to the same

type of information a registration statement would provide to a member of the general

public. <u>SEC v. Ralston Purina Co.</u>, 346 U.S. 119, 124-25 (1953) (Courts must inquire

whether allowing the exemption is consistent with the promotion of the "full disclosure of

information thought necessary to informed investment decisions" and whether "the class of

persons affected needs the protection of the [Securities] Act."). The factors to be

considered in determining whether the exemption applies include: the number of

potential investors; their relationship to the issuer and to one another; the manner of the offering, information disclosure or access; and the sophistication of the potential investors.  Western Fed. Corp. v. Erickson, 739 F.2d 1439, 1442 (9th Cir.1984). Sophistication of the potential investor will not, however, substitute for access to information.  SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 11-12 (D.D.C.1998) (citing Doran v. Petroleum Mgmt. Corp., 545 F.2d 893, 902-03 (5th Cir. 1977)).  The "critical question" in determining whether an offering is public is "whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information." Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 03 Civ. 10165 (RJH), 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) (quoting Gilligan, Will & Co. v. SEC, 267 F.2d 461 (2d Cir.1959) (internal quotation marks omitted)).

Here, defendants have not made any showing of entitlement to a Section 4(2) exemption.  Nothing in the record indicates defendants offered EDG Securities only to those in a position to have the same information on the Fund or EDG that a registration statement would provide.  Moreover, the Individual Defendants concede that they targeted investors from a list of 5,000 names of strangers supplied by a marketing company.  (Strashnov Tr. at 78-80; Ayngorn Tr. at 53.)  Notwithstanding the Individual Defendants' belief that they were supplied with a list containing only accredited investors, the record reveals that some investors that were successfully solicited by defendants were not accredited as the law defines that term.  Defendants would have known those investors were unaccredited either from obtaining their financial information by telephone during the solicitation call or after reviewing the investor questionnaires that all

potential investors were required to complete.  Defendants cannot establish that the EDG

Securities are entitled to an exemption under Section 4(2).

Having failed to establish an applicable exemption under either Rule 506

of Regulation D or Section 4(2) of the Securities Act, defendants are liable for violating

Sections 5(a) and 5(c) of the Securities Act.

c.   Fraud Claims

Section 10(b) and Rule 10b-5 prohibit fraud in connection with the

purchase or sale of a security.  United States v. Naftalin, 441 U.S. 768, 772, (1979).  To

state a claim under Section 10(b) and Rule 10b-5, a plaintiff must show (1) a

misrepresentation or omission regarding material facts or other fraudulent conduct; (2)

made with scienter; (3) in the offer or sale, or in connection with the purchase or sale of a

security.  Suez Equity Invest., L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir.

2001).[4]  The same elements required to establish a Section 10(b) and a Rule 10b-5

violation suffice to establish a Section 17(a)(1) violation.[5]  See S.E.C v. Monarch

Funding Group, 192 F.3d 295, 308 (2d Cir. 1999).

---

[4] Section 10(b) provides in relevant part:
It shall be unlawful . . . To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.  15 U.S.C. § 78j(b).

Rule 10b-5 provides in relevant part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5

[5] Section 17(a)(1) provides in relevant part:
It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

A statement or omission is material if a reasonable investor would view its disclosure as "significantly alter[ing] the 'total mix' of information . . . available." TSC Indust. v. Northway, Inc., 426 U.S. 438, 449 (1976). Scienter can be inferred from circumstantial evidence, Herman & MacLean v. Huddleston, 459 U.S. 375, 390-91 n.30 (1983), and may be established through a showing of a reckless disregard for the truth. SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998) (citations omitted).

Plaintiff has come forward with evidence that defendants published facts to investors that they knew were false and omitted material facts from those publications in violation of the antifraud provisions of the securities laws. Plaintiff has also provided evidence that defendants showed a reckless disregard for the truth when making untrue statements that they should have known to be false.

### i. Material Omissions

#### 1. Individual Defendants' Salaries

Plaintiff asserts that defendants misrepresented the true amount of the Individual Defendants' salaries in the December 8, 2004 letter because those salaries were never reduced or deferred by 70% as the letter stated and investors were never subsequently informed that the stated deferral did not occur. In addition, plaintiff contends that defendants failed to inform investors that Ayngorn was making excessive withdrawals to support his gambling and alcohol addictions. Defendant EDG responds to plaintiff's contentions with only a conclusory statement that plaintiff has failed to meet the standard required to establish fraud. Concealing Ayngorn's excessive withdrawals to support his gambling and alcohol addictions and failing to inform investors that salaries

---

(1) to employ any device, scheme, or artifice to defraud . . . 15 U.S.C. § 77q(a)(1).

were not being deferred by 70% as promised in the December 8, 2004 letter, were both highly material omissions that a reasonable investor would view as significantly altering the "total mix" of information available.  TSC Industries, 426 U.S. at 449.  The Court concludes that even if failing to so inform investors was unintentional, it was reckless as a matter of law.  McNulty, 137 F.3d at 741 (Reckless disregard for the truth may be shown through "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care.'") (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir . 1978)).

### 2.  The Two Investment Properties

Defendants' failed to disclose to investors and potential investors that the only two properties purchased purportedly for EDG or the Fund, the Brooklyn property and the Fairlawn, New Jersey property, were deeded respectively to Ayngorn and his wife and Strashnov rather than to EDG or the Fund.  Defendants also failed to disclose to investors that both properties were mortgaged in the names of the principals.  In addition, EDG failed to disclose that Ayngorn transferred the deed to the Brooklyn property solely to his wife to avoid mechanics liens.  Such information regarding the only two properties ever purchased in furtherance of the Fund's and EDG's business plans is something an investor would consider "significantly alter[ing] the 'total mix' of information . . . available." TSC Industries, 426 U.S. at 449.  That Ayngorn had been using the Brooklyn property as his personal residence for months without paying rent, a fact also undisclosed by defendants, is also something an investor would consider significant and defendants' failure to disclose such a fact is a material omission.  Even if the above-cited omissions

were unintentional, it was reckless for defendants not to disclose them. <u>McNulty</u>, 137 F.3d at 741.

Defendants also failed to disclose that the "leading builder" that defendants claimed to have partnered with in the January 6, 2006 letter was a company owned by Ayngorn's father despite more than $200,000 having been paid to that company by EDG. This fact is also one an investor would consider significant and its omission is material. Even if it was unintentional, such an omission was a reckless departure from the standards of ordinary care. <u>Id.</u>

### 3. Strashnov's Prior Judgment

Plaintiff asserts that failing to disclose Strashnov's prior status as a defendant in a lawsuit filed by the New York State Attorney General for fraud and misappropriation in connection with the sale of stock was also an actionable material omission. Indeed, nothing about the lawsuit or Strashnov's signing a consent judgment enjoining him from engaging in fraudulent practices and from offering, selling or promoting securities in New York was ever disclosed to investors or potential investors. Strashnov testified that he never made himself fully aware of the terms of the consent judgment despite his having signed it. Conscious avoidance of the facts is the equivalent of knowledge under these circumstances. <u>See</u> <u>S.E.C. v. McNulty</u>, No. 94 CIV. 7114 (MBM), 1996 WL 422259, at *12-14 (S.D.N.Y. July 29, 1996) (One cannot "escape liability . . . by closing his eyes to what he saw and could readily understand.") (citation and internal quotation marks omitted), <u>aff'd</u>, 137 F.3d 732 (2d Cir. 1998). The Court concludes that a reasonable investor would want to know of the consent judgment when considering whether to invest and failing to so inform investors was reckless as a matter

of law.  Breard v. Sachnoff & Weaver, Ltd., 941 F.2d 142, 144 (2d Cir. 1991) ("failure to

mention . . . conviction in initial offering memorandum could be considered reckless as a

matter of law.").

> ii.  Misrepresentations

> 1.  Registration/IPO

Plaintiff has also proffered evidence that defendants misrepresented to

investors that the EDG Securities were registered.  Strashnov, the author of the investor

letters and "news release[s]," testified that he believed a Regulation D filing completed by

EDG's corporate attorney was "in fact an SEC registration" and it therefore was not an

intentional misrepresentation to inform investors that registration had occurred.

(Strashnov Tr. at 213.)  The Court concludes that an issuer engages in "highly

unreasonable" conduct which "represents an extreme departure from the standards of

ordinary care" when it or its principals fail to investigate and learn the meaning of

common terms of art in the securities context before using such terms in communications

and solicitations to investors.  McNulty, 137 F.3d at 741.  Thus, defendants

representation that EDG Securities were registered when, in fact, they were not, showed a

reckless disregard for the truth and violated the antifraud provisions of the securities

laws.

> 2.  EDG Business Ventures/Future Financing

As evidence of further fraudulent misrepresentations made by defendants,

plaintiff points to statements in EDG's March 18, 2005 letter asserting that "16 potential

profitable projects" had been targeted with "each property [able to] yield profit margins

from $65k to as high as $100k per project." (Id. Exh. 17.)  The letter further states that

EDG's "expected [r]evenue growth should exceed $18-21 Million with in [sic] 36 months of commercial operations, while achieving [w]orking [c]aptial in excess of $9-12 Million in that same time period." (Id.)  As previously noted, Strashnov could not recall the address of any of the purported 16 properties and testified that no documents existed regarding those 16 properties.  He also admitted that the revenue and capital estimates set forth in the letter could not be achieved unless the Fund offering was fully subscribed.  As of the date of the letter, however, fewer than half of the Fund securities had been sold.  Yet the March 18, 2005 letter mentions nothing about the projections being fully dependant upon something that had not occurred.  The Court concludes that the above statements were fraudulent misrepresentations regarding material facts and were made with scienter.  See e.g., Herman, 459 U.S. at 390-91 n.30.

The Court comes to the same conclusion with respect to EDG's statement in a January 6, 2006 letter that EDG's "acquisition phase is currently underway with a series of development projects being finalized as we speak." (Id. Exh., 18.)  The record shows that no development projects were being finalized at that time.  Strashnov testified that the "series of projects" he was referring to in the letter was, in fact, a single project in Howell, New Jersey which, according to Strashnov, "just wasn't feasible" because EDG did not have the $4 million the investment required.  (Strashnov Tr. at 222.)

Similarly, the Court concludes that EDG's June 1, 2006 statement that "Management is actively pursuing plans to start developing projects in . . . Florida, Nevada and California" was a fraudulent misrepresentation made with scienter.  The record shows that no projects were ever pursued in those states.  Strashnov testified that EDG would have pursued those opportunities "if the additional financing was available to us," but that

is far different from affirmatively stating that EDG was "actively pursuing" plans as was stated in the letter.  (Id. at 248.)

EDG also represented to investors in a January 5, 2007 letter that "Management is currently in negotiations with corporate counsel to achieve a large financial infusion thru [sic] Pipeline Financing, utilizing some of the financial communities [sic] biggest names."  The record reveals, however, that in truth, no such negotiations were occurring or ever occurred.  Strashnov testified that this statement was based solely upon EDG's corporate counsel's statement that he "had access to contacts that do pipeline financing."  (Strashnov Tr. at 246.)  The Court concludes that the January 5, 2007 statement regarding pipeline financing was a fraudulent misrepresentation of material fact made with scienter.

Finally, plaintiff asserts the repeated statements made by EDG about an imminent plan to go public were fraudulent misrepresentations because Ayngorn admitted that he never had any near-term expectations about EDG becoming a publicly traded company and stated that he did not recall discussing an IPO with Strashnov.  (Ayngorn Tr. at 146-47.)  The statements in the record regarding EDG becoming a publicly-traded company, however, have not been demonstrated to be actionable securities fraud because Plaintiff has not shown that defendants ever stated that an IPO was imminent.  True, EDG mentioned "taking the next step forward to potentially becoming a publicly traded company in the future" (Birnbaum Decl, Exh. 14) and that registering securities was "the first major step to allow EDG to achieve public market status" (Id., Exh. 15), as well as stating that it "anticipate[s] that following the company's latest offering [of $25 million] we will be able to achieve public market status thru [sic]

an Initial Public Offering (IPO)." (Id., Exh. 16), but those statements do not amount to a statement that an EDG IPO was imminent; rather they express hope and anticipation that it will occur at an unspecified future date. Thus, summary judgment is denied with respect to this single aspect of plaintiff's securities fraud claims.

III.   Relief

The SEC seeks permanent injunctive relief, disgorgement and the award of civil money penalties pursuant to 15 U.S.C. §§ 77t(d) and 78u(d). The SEC is directed to make an updated supplemental submission on relief by June 20, 2008; defendants may respond by July 10, 2008 and the SEC may reply by July 23, 2008.

IV.   Conclusion

For all the foregoing reasons, plaintiff's motion for summary judgment is granted in part and denied in part.


SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       May 30, 2008